626 A.2d 1186

**Messody PERLBERGER, Appellant,**

v.

**Norman PERLBERGER.**

**Norman PERLBERGER,**

v.

**Messody PERLBERGER, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 21, 1992.

Filed June 2, 1993.

---

246

248

250

252

Geoffrey R. Johnson, Philadelphia, for appellant.

Norman Perlberger, in pro per.

Before CIRILLO, TAMILIA and KELLY, JJ.

CIRILLO, Judge.

Appellant Messody Perlberger appeals from consolidated orders of the Court of Common Pleas of Montgomery County entering a final decree in divorce, ordering equitable distribution of the marital property, requiring that Norman Perlberger (husband) pay child support and alimony, and denying wife's post-trial motions regarding the divorce and various economic issues. We affirm in part, and vacate and remand in part.

The parties were married on November 13, 1971. Three children were born of the marriage: Jennifer, age 20, Karen, age 14, and Laura, age 9.

Norman Perlberger is a 1972 graduate of Temple Law School. Following a judicial clerkship with the Honorable Sydney J. Hoffman, husband worked for the law firm of Blank, Rome, Comisky & McCauley (Blank, Rome). He became a partner in the firm in 1979. In 1988 husband left the firm in order to open his own practice, Perlberger & Haft (P & H). Thereafter, husband became the sole owner of the law firm known as Perlberger Law Associates (PLA). PLA has offices in Montgomery County and handles primarily asbestos

cases and domestic relations cases. Norman Perlberger is recognized as an expert in domestic relations law, products liability law, and asbestos litigation.

Messody Perlberger was born in French Morocco. In 1969 she emigrated to the United States. Messody Perlberger is a college graduate and holds a master degree and a doctorate in French Literature. Wife's employment history is limited to part-time teaching while her husband was in law school. Wife has not worked outside the home since 1977, choosing instead to dedicate herself to raising her three children and managing the household.

On May 4, 1987, sixteen years after the parties were married, husband left the marital home to live with another woman. On May 6, 1987, husband filed a consolidated complaint in divorce, requesting a divorce under both the fault and no-fault provisions of the Divorce Code,[1] an order for equitable distribution of the marital property,[2] a confirmation of shared physical and legal custody of the children,[3] and a confirmation of voluntary child support.[4]

Approximately four and one-half years later, on October 21, 1991, the Honorable Albert R. Subers entered a decree divorcing the parties from the bonds of the marriage. The court also entered an order distributing the marital property and disposing of the remaining economic issues, including counsel fees, child support, and alimony. At the time of distribution, husband was 46 years old, and wife was 42 years old. In its order, the court denied husband's petition for bifurcation.[5]

---

1. 23 Pa.S. §§ 201(a), (c), and (d). The Divorce Code, 23 P.S. §§ 101–801, was repealed by Act of December 19, 1990, P.L. 1240, No. 206, § 2, and reenacted as Part IV of the Domestic Relations Code. *See* 23 Pa.C.S. §§ 3101–3707 (Purdon Supp.1991).

2. 23 Pa.C.S. §§ 3501–3508.

3. 23 Pa.C.S. §§ 5301–5314.

4. 23 Pa.C.S. §§ 4301–4354.

5. Granting bifurcation at this time would have served no purpose since the court simultaneously disposed of both the marital and economic issues. We are, however, perplexed as to why bifurcation was not granted earlier in the proceedings. Husband's motion to bifurcate was filed on April 26, 1990; it was not resolved for a year and a half despite

The court's order distributed the marital estate as follows: [6]

**TO WIFE:**

1. Fee simple title to 320 Mulberry Lane Elkins Park, PA

| | |
|---|---|
| Value | $240,000.00 |
| Less Mortgage | $109,000.00 |

$130,389.00

2. Contents of 320 Mulberry Lane

| | |
|---|---|
| Furnishings | $ 20,000.00 |
| Art work | $ 50,000.00 |

$ 70,000.00

3. Fifty percent (50%) of the Merrill Lynch CMA Account — $ 58,627.00

4. Automobile—1987 Volvo — $ 8,500.00

5. Wife's IRA — $ 16,000.00

6. Fifty percent (50%) of net proceeds of sale of five (5) Dorchestor Condominiums ($321,950. × 50%) — $115,975.00

7. Fifty percent (50%) of net proceeds of sale of 9600 Atlantic Avenue, Margate, NJ ($77,400 × 50%) — $ 38,700.00

TOTAL — $438,191.00

**TO HUSBAND:**

1. Husband's IRA — $ 11,509.00

2. Fifty percent (50%) of the Merrill Lynch CMA Account — $ 58,627.00 [7]

the fact that the parties had lived apart for the statutory period. *See Wolk v. Wolk*, 318 Pa.Super. 311, 464 A.2d 1359 (1983); *Syno v. Syno*, 389 Pa.Super. 505, 567 A.2d 717 (1989).

**6.** Husband's final distribution from the Blank, Rome Profit Sharing Plan was valued at $243,652.35 and was included as part of the marital property. The trial court determined that this amount was offset by marital debt and joint income tax liabilities on tax returns filed prior to separation.

**7.** We note that the trial court distributed one-half of the Merrill Lynch CMA Account (valued at $117,254.00) to each party, but incorrectly stated in its opinion that the husband was awarded *$50,627.00,* instead of *$58,627.00.* We have corrected this mathematical error, as well as the total of the husband's award, which, consequently, was also incorrect. The trial court had totalled the husband's award at *$234,702.00,* when in fact it was $8,000.00 more—*$242,702.00.*

| | | |
|---|---|---|
| 3. | Fifty percent (50%) of net proceeds of sale of five (5) Dorchestor Condominiums | $115,975.00 |
| 4. | Fifty percent (50%) of net proceeds of sale of 9600 Atlantic Avenue, Margate, NJ | $ 38,700.00 |
| 5. | Judicate Stock | $ 10,000.00 |
| 6. | Ryan Home Stock | $ 6,246.00 |
| 7. | DDI Stock | $ 1,645.00 |
| | TOTAL | $242,702.00 |

The court found that wife had an earning capacity of $30,000.00 per year, and order husband to pay alimony to wife in the amount of $585.00 per week for a period of ten years.[8] Husband was also ordered to pay child support for three children in the amount of $701.00 per week from November 10, 1987 to August 31, 1991. Beginning September 1, 1991, husband was ordered to pay support for two children in the amount of $640.00 per week. Husband was also ordered to pay college expenses for the oldest child. The divorce was granted pursuant to section 3301(d) of the Divorce Code. 23 Pa.C.S. § 3301(d).

Wife filed post-trial motions alleging fifty points of error on the part of the trial court. Following oral argument, Judge Subers denied the post-trial motions. On appeal, wife raises the following ten issues:[9]

8. The youngest child, in second grade at the time of the order, should be completing her senior year of high school when alimony payments cease. The alimony order, therefore, allows wife to choose not to work outside the home while the youngest child completes her primary and secondary school education. The alimony payments over a period of one year equal $30,420.00 ($585.00 × 52), approximating wife's annual earning capacity. *See infra.*

9. Despite the complexity of this litigation, we find it somewhat remarkable that appellant found fifty separate alleged errors on the part of the trial court. On appeal, appellant has brought forth ten of those alleged errors. We refer appellant and her counsel to the insights of the Honorable Ruggero J. Aldisert of the United States Court of Appeals for the Third Circuit:

When I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to any of them. I do not say that it is an irrebuttable presumption, but is a presumption that

1. Did the trial court err in refusing to grant a fault divorce to wife?

2. Did the trial court err in excluding the value of husband's law firm from the marital estate?

3. Did the trial court err in denying wife discovery regarding husband's law firm?

4. Did the trial court err in concluding that the monies from the Provident Bank accounts were traced into the Merrill Lynch CMA account?

5. Did the trial court err in exercising jurisdiction over the petition to restore the PUGMA accounts?

6. Did the trial court abuse its discretion in ordering wife to restore funds to the PUGMA accounts?

7. Did the trial court err in concluding that wife failed to request alimony pendente lite?

8. Did the trial court abuse its discretion in its determinations of spousal support, child support and alimony?

9. Did the trial court err in precluding wife's discovery of and evidence of husband's earning capacity based on compensation received from completed asbestos cases?

10. Did the trial court err in denying wife counsel fees?

An amendment jointly introduced by Representative Anthony J. Scirica of Montgomery County and Representative Joseph M. Rocks of Philadelphia County formed the basis of what is commonly known as "no-fault" divorce.[10] Section

reduces the effectiveness of appellate advocacy. Appellate advocacy is measured by effectiveness, not loquaciousness.
*United States v. Hart*, 693 F.2d 286, 287 n. 1 (3d Cir.1982) (quoting Aldisert, *The Appellate Bar: Professional Competence and Professional Responsibility—A View from the Jaundiced Eye of One Appellate Judge*, 11 Cap.U.L.Rev. 445, 458 (1982)). *See also Hughes v. GAF Corporation*, 364 Pa.Super. 311, 528 A.2d 173 (1987).

**10.** September 25, 1979, HJ 1827R, HJ 1828L. Although Representatives Scirica and Rocks jointly sponsored the no-fault amendment providing for divorce based upon the mutual consent of the parties, *see* 23 Pa.C.S. § 3301(c), they disagreed on the unilateral no-fault provision which provided for a no-fault divorce based upon "irretrievable breakdown." *See* 23 Pa.C.S. § 3301(d). Representative Scirica stated that the inclusion of the unilateral provision would not necessarily increase

3301(c) of the Divorce Code provides for a no-fault divorce based upon the parties' mutual consent. 23 Pa.C.S. § 3301(c).

> **(c) Mutual consent.**—The court may grant a divorce where it is alleged that the marriage is irretrievably broken and 90 days have elapsed from the date of commencement of an action under this part and an affidavit has been filed by each of the parties evidencing that each of parties consents to the divorce.

23 Pa.C.S. § 3301(c). Section 3301(d), the section under which the Perlbergers were divorced, provides for a no-fault divorce if the parties have lived separate and apart for the statutory period and the marriage is irretrievably broken:

> **(d) Irretrievable breakdown.**—
>
> (1) The court may grant a divorce where a complaint has been filed alleging that the marriage is irretrievably broken and an affidavit has been filed alleging that the parties have lived separate and apart for a period of at least two years and that the marriage is irretrievably broken and the defendant either:
>
> (i) Does not deny the allegations set forth in the affidavit.

the divorce rate or provide for "divorce on demand." September 25, 1979, HJ1831L. He argued that excluding the unilateral provision from House Bill 640 would result in the following:

> In the first place, it will leave us with only two grounds for divorce: mutual consent and the old traditional fault grounds. Now under mutual consent, since both parties have to file an affidavit evidencing their consent, it is axiomatic that both will not do that or neither will do that until they have worked out their economic differences. If they can do that, they will go ahead with the mutual consent ground. If they cannot agree on the property settlement and on the question of custody and child support and visitation and distribution of property and post-divorce alimony, if they cannot agree, then they have ... two options available to them. One is to go out of state and obtain a divorce there and the other is to proceed under the traditional fault grounds....

September 25, 1979, HJ 1831L, 1831R. The amendment eventually was included in the Divorce Code, 1980, April 2, P.L. 63, No. 26, § 201, and was subsequently amended to reduce the statutory period during which the parties must live separate and apart, from three years to two years. 1988, February 12, P.L. 66, No. 13, § 1.

(ii) Denies one or more of the allegations set forth in the affidavit but, after notice and hearing, the court determines that the parties have lived separate and apart for a period of at least two years and that the marriage is irretrievably broken.

\* \* \* \* \* \*

23 Pa.C.S. § 3301(d).

In husband's complaint, he sought a divorce based upon both sections 3301(c) and (d), as well as upon fault grounds. The court granted the parties a no-fault divorce pursuant to 23 Pa.C.S. § 3301(d), based upon a finding that the parties had lived separate and apart for the statutory period and that the marriage was irretrievably broken. *Id.* In her counterclaim, wife had sought, in addition to her economic claims, a divorce based on fault grounds, namely adultery and indignities. *See* 23 Pa.C.S. § 3301(a)(2), (6).[11] Wife now argues that the court erred in not granting her a divorce based on fault.

When the legislature added the no-fault grounds for divorce, it intended that the Divorce Code retain the traditional fault grounds for divorce. *See Restifo v. Restifo,* 339 Pa.Super. 352, 489 A.2d 196 (1985). The legislature expressly stated its findings and intent, recognizing that the family is the basic unit of society, and that the protection and preservation of the family is of paramount public concern. 23 Pa.C.S. § 3102(a). Acknowledging this, the legislature pronounced the following as the policy of the Commonwealth: to make the legal dissolution of marriage effective for dealing with the realities of matrimonial experience; to encourage reconciliation and settlement, especially where children are involved; to give pri-

---

11. Section 3301 provides in relevant part:

§ **3301. Grounds for divorce**

(a) **Fault.** The court may grant a divorce to the innocent and injured spouse whenever it is judged that the other spouse has:

\* \* \* \* \* \*

(2) Committed adultery.

\* \* \* \* \* \*

(6) Offered such indignities to the innocent and injured spouse as to render that spouse's condition intolerable and life burdensome.

23 Pa.C.S. § 3301(a)(2), (6).

mary consideration to the welfare of the family rather than the vindication of private rights or the punishment of matrimonial wrongs; to mitigate harm to the parties and children; to seek the causes of family disintegration and utilize available resources; and to effectuate economic justice between parties. 23 Pa.C.S. §§ 3102(a)(1)–(6).

■ The purpose of enacting no-fault divorce provisions was to provide for the legal dissolution of a marriage in a manner which would keep pace with contemporary social realities. Our lawmakers were reluctant to legislate divorce reform and, after twenty years of debate,[12] the 1980 Divorce Code [13] was enacted.

The sanctity of marriage and the dominant desire to preserve that union was embedded in the theory of the prior Divorce Law; [14] that law remained virtually unchanged since first enacted in 1785 and recodified in 1815.[15] The law acknowledged the strength of the family unit and the necessity of ensuring its preservation. Too frequently, however, the application of the law preserved the family unit in form only,

12. The Joint State Government Commission (JSGC) was created by the Act of 1937, July 1, P.L. 2460, as amended December 8, 1959, P.L. 1740. The JSGC appointed a task force to determine if there existed a need for reform in Pennsylvania's divorce laws. In 1961, the task force submitted a report on needed reform and undertook the drafting of a proposed Marriage and Divorce Code. *See* JSGC Report, pp. vi-vii.

13. Title 23 of Purdon's Statutes, as enacted by Act 1980, April 2, P.L. 63, No. 26, § 101 et seq., effective in 90 days, was amended by Act 1990, Dec. 19, P.L. 1240, No. 206, effective in 90 days. The text has been consolidated at 23 Pa.C.S. § 3101 *et seq.* and is entitled Domestic Relations. Part IV is entitled the Divorce Code. The 1990 amendments have not substantively affected the disposition of property rights after termination of the marriage.

14. Act of May 2, 1929, P.L. 1237, 23 P.S. § 10. Repealed. 1980, April 2, P.L. 63, No. 26, § 801.

15. The preamble to The Divorce Act of 1815 stated:
Whereas, the divine precepts of the Christian religion ... and the object of parties entering into the marriage state, require that it should continue during their joint lives; yet where one of the parties is under natural or legal incapacity ... or is guilty of acts inconsistent with the sacred contract ... society should give relief to the innocent and injured party.
6. Sm.L. 286.

its consequential pain arguably greater than the loss it sought to prevent. Judge Spaeth's dissenting opinion in *Dukmen v. Dukmen*, 278 Pa.Super. 530, 537, 420 A.2d 667, 671 (1980), is telling:

> Perhaps the Divorce Law is flawed in not making the decisive factor in a divorce action the cessation of a loving relationship between the parties. It is our function, however, to apply the law. Thus, this court has consistently held that under the Divorce Law, the inability to live together does not constitute a ground for divorce. (citations omitted). Further, we have equally consistently held "that where both parties are nearly equally at fault, so that neither can clearly be said to be the injured and innocent spouse, the law will grant a divorce to neither on the ground of indignities to the person, but will leave them where they put themselves." *Simons v. Simons*, 196 Pa.Super. 650, 656, 176 A.2d 105, 108 (1961).

*Id.*, 278 Pa.Super. at 537, 420 A.2d at 671.

The adoption of the 1980 Divorce Code, and in particular the no-fault provision of irretrievable breakdown, *see* 23 Pa.C.S. § 3301(d), allowed a dependent spouse to take advantage of the economic protections of the law without having to resort to seeking a divorce on fault grounds. The legislature provided this section with the economic benefits for good reason: to avoid, where possible, a contested divorce, "the raw searing battle that some commentators have likened to guerrilla warfare." [16]

16. September 25, 1979, HJ1832L (Comments of Representative Scirica on the amendment to delete the unilateral no-fault provision from HB640.).

During the legislative debates, the idea was posed that the no-fault mutual consent provision was sufficient for Pennsylvanians, and that the unilateral no-fault provision (irretrievable breakdown) would only contribute to the decay of society. September 25, 1979, HJ1834R (Comments of Representative Vroon, Chester County). Representative Pitts of Chester County pointed out:

"[T]he final reason that comes to mind as to why people enter a contest to a divorce, other than the economics and property of the matter, is simply spite and hardheartedness, ...

September 25, 1979 HJ1835R.

In arguing that the trial court erred in not granting her a divorce on fault grounds, either based upon adultery or indignities, wife apparently seeks recompense for husband's alleged misconduct; however, "the vindication of private rights or the punishment of matrimonial wrongs" is expressly proscribed in the Divorce Code's legislative findings and intent. *See* 23 Pa.C.S. § 3102(a)(3). Frankly, we are unable to discern from wife's argument exactly what relief she seeks or what benefit she might obtain from a fault divorce.[17] Wife offers this court no argument other than the court erred since husband had admitted committing adultery during the parties' separation.

■■■ Wife is entitled to the economic benefits of the Divorce Code, including equitable distribution and alimony, even though the divorce was based upon the no-fault ground of irretrievable breakdown. Furthermore, marital misconduct may not be considered by the court in determining an order of equitable distribution. Section 3502(a) states in relevant part:

**(a) General rule.**—In an action for divorce or annulment, the court shall, upon request of either party, equitably divide, distribute or assign, in kind or otherwise, the marital property between the parties *without regard to marital misconduct* . . .

23 Pa.C.S. § 3502(a) (emphasis added). With respect to alimony, section 3701 of the Divorce Code provides that the court may consider marital misconduct, along with all other

**17.** The legislature has attempted to account for human nature in the Divorce Code. The Commonwealth's policy eschews vindication of private rights and punishment for marital wrongs. 23 Pa.C.S. § 3102(a)(3). For practical purposes, however, this policy is difficult to implement; to some extent one party can delay or control the proceedings. Marriage should be neither entered nor exited lightly, but if one party does desire to be free from the marital bond, the other party often has the opportunity, and the legal back-up, to exact a lopsided settlement or engage in endless delay tactics. One party, equipped with a legal arsenal, can hold the other hostage to his or her economic demands, essentially extorting a divorce settlement. The no-fault provisions were added as a detour around the adversarial justice system and the side-effects of that system—delay, conflict, discord, and mounting legal fees, all of which are heightened when children are involved. This is counter to the Commonwealth's policy, and the antithesis of what the legislators had hoped to accomplish in enacting divorce reform.

relevant factors, in determining whether alimony is necessary and in determining the nature, amount, duration and manner of payment. 23 Pa.C.S. § 3701(b)(14). However, "marital misconduct of either of the parties *from the date of final separation shall not be considered* by the court in its determinations relative to alimony." *Id.* (emphasis added). In any event, wife received both alimony and child support.

■ Even though the granting of a fault divorce to one party may preclude an award of alimony to the other party, that principle is inapplicable in the circumstances here. Husband has not sought support. *See Keller v. Keller,* 275 Pa.Super. 573, 419 A.2d 49 (1980). We conclude, therefore, that the trial did not err in granting a divorce on no-fault grounds.

## I.

Next, wife contends that the trial court erred in excluding the value of husband's law firm from the marital estate. The trial court determined that the law firm known as Perlberger Law Associates, P.C. was established in June of 1988, approximately thirteen months after the parties had separated. The law firm had carried over a substantial inventory of contingent fee cases, included asbestos-related cases, from husband's prior law firm, Blank, Rome. The trial court excluded the value of PLA from the marital estate.

Wife argues that PLA was created and maintained with marital assets. Specifically, she alleges that husband's partnership interest in Blank, Rome was a marital asset and that his Provident Credit Line, which provided the start-up capital for PLA, was established at Blank, Rome for all partners. Consequently, she argues, the utilization of a marital asset for the formation of a post-separation asset establishes that asset as marital property. Additionally, wife claims that husband borrowed marital property to sustain the fledgling law firm, and that these monies have never been repaid.

■ "Marital property" is "all property acquired by either party during the marriage, ..." 23 Pa.C.S. § 3501(a). The

presumption of marital property is rebuttable, and property may be established as separate by a preponderance of the evidence. *See* 23 Pa.C.S. § 3501(b); *Sutliff v. Sutliff,* 518 Pa. 378, 543 A.2d 534 (1988); *Braderman v. Braderman,* 339 Pa.Super. 185, 488 A.2d 613 (1985). Additionally, assets acquired after separation through the use of marital assets are marital property. *See Gioia v. Gioia,* 382 Pa.Super. 538, 555 A.2d 1330 (1989); *see also Sutliff v. Sutliff,* 361 Pa.Super. 504, 522 A.2d 1144, (permitting tracing of assets) *rev'd on other grounds,* 518 Pa. 378, 543 A.2d 534 (1988).

It is the function of the court to determine whether a property right has been acquired during marriage and whether equity warrants its inclusion into the marital estate. *Flynn v. Flynn,* 341 Pa.Super. 76, 491 A.2d 156, 159 (1985). If the asset is deemed includable in the marital estate, the allocation of that interest must be consistent with the legislative intent to effectuate economic justice between the parties. 23 Pa.C.S. § 3102(a)(6).

■ Whether the interest is marital property or separate property for purposes of distribution of the marital estate is a matter within the sound discretion of the trial court. *Ruth v. Ruth,* 316 Pa.Super. 282, 462 A.2d 1351 (1983). An abuse of discretion occurs if the trial court fails to follow correct legal procedure or misapplies the law. *Braderman, supra.* In determining whether a court has abused its discretion, we do not usurp the trial court's duty as finder of fact. *Barnhart v. Barnhart,* 343 Pa.Super. 234, 237, 494 A.2d 443, 444 (1985). The trial court's findings of fact, if supported by credible evidence, are binding upon a reviewing court and will be followed. *Campbell v. Campbell,* 357 Pa.Super. 483, 490, 516 A.2d 363, 366 (1986).

■ Here, wife contends that husband's interest in PLA, a sole proprietorship, was established with funds from his partnership interest in Blank, Rome as well as from funds borrowed from marital accounts. A partnership interest is a property interest. *See Buckl v. Buckl,* 373 Pa.Super. 521, 542 A.2d 65 (1988); *see also Provident Trust Co. of Phila. v.*

*Rankin,* 333 Pa. 412, 5 A.2d 214 (1939); *Northampton Brewery Corp. v. Lande,* 138 Pa.Super. 235, 10 A.2d 583 (1940). Husband's final partnership distribution from Blank, Rome, his capital contribution less indebtedness to the firm, amounted to $243,652.35. The parties do not dispute that this partnership interest was a marital asset. *See McCabe v. McCabe,* 525 Pa. 25, 575 A.2d 87 (1990); *Buckl, supra.* This amount was rolled over into husband's IRA. The trial court found that "virtually all" of this was used, as noted above, to offset marital tax liability. *See Duff v. Duff,* 510 Pa. 251, 507 A.2d 371 (1986) (utilizing marital funds to satisfy joint obligations of the parties constitutes a disposition in good faith, and the property is therefore excluded from the marital estate); *see also Lowry v. Lowry,* 375 Pa.Super. 382, 544 A.2d 972 (1988).

With respect to the loans to PLA made from accounts consisting of marital funds, the wife refers us to husband's testimony on cross-examination:

Q: Mr. Perlberger, directing your attention to the Provident credit line, that was a personal credit line to you and not a credit line to your companies?

A: Yes. Companies? One company. I have a law firm.

Q: But you have a successor law firm—

A: No, it's not a successor law firm. It's a name change and you know that. There is one company that has changed its name.

Q: Did you enter into a stock redemption agreement with Mr. Haft?

A: Yes.... The firm was losing money each month. We made some settlements in November and December of '88 which were still not paid because it takes some time to process settlements. Our cash flow was at a point where our credit line, which was $300,000, had already been drawn down to somewhere between $250,000 and $275,000. We were at the brink of exhausting our credit line with Constitution Bank. We were reaching a payroll which we make twice a month, and because we didn't have enough money in

payroll, I invaded my own pension account, withdrew $50,-000 from my pension account, contributed $40,000 of it to the firm to meet payroll, and had to pay all the penalties for that transfer because it was a premature withdrawal from the pension account.... Larry Haft and I had co-signed the loan with Constitution Bank because we were both shareholders.... As a result of the financial position of that firm in March of '89, Larry [Haft] was very uncomfortable with continuing to be at risk. He didn't know what the future of the firm was....

Wife contends that this $50,000 withdrawal was never reimbursed to the marital estate. Husband's statement in his brief that the proceeds from the Blank, Rome account "were considered and dealt with by the lower court" does little in the way of response or illumination on this issue.

Although the withdrawal originated from a fund comprised of husband's partnership distribution from Blank, Rome, a marital asset, *Bold v. Bold,* 358 Pa.Super. 7, 516 A.2d 741 (1986), we are unable to conclude from the sparse argument and reference in wife's brief that the trial court abused its discretion in its final distribution order. In assessing the propriety of a marital property distribution scheme, our standard of review is whether the trial court, by misapplication of the law or failure to follow proper legal procedure, abused its discretion. *Johnson v. Johnson,* 365 Pa.Super. 409, 529 A.2d 1123 (1987). An "abuse of discretion" is not lightly found; it must be established by clear and convincing evidence. *Sergi v. Sergi,* 351 Pa.Super. 588, 591, 506 A.2d 928, 930 (1986). "Specifically, we measure the circumstances of the case, and the conclusions drawn by the trial court therefrom, against the provisions of 23 [Pa.C.S. § 3502(a) ] and the avowed objectives of the Divorce Code, that is, 'effectuate economic justice between the parties ... and insure a fair and just determination of their property rights.' 23 [Pa.C.S. § 3102(a)(6) ]." *Hutnick v. Hutnik,* 369 Pa.Super. 263, 266–7, 535 A.2d 151, 152 (1987).

■ Following a review of the parties' arguments and the record before us, as well as consideration of the circumstances and equities of this case, we conclude that the trial court's exhaustive efforts to equitably divide the marital property and effect economic justice between the parties did not amount to an abuse of discretion. *Johnson, supra; Sergi, supra. Cf. Adelstein v. Adelstein,* 381 Pa.Super. 221, 553 A.2d 436 (1989) (appreciation in value of business due to post-separation efforts of one party may be considered by the court in determining equitable distribution award).

■ Wife also contends that the contingent fee cases should have been included as part of the marital estate because they originated from husband's work at Blank, Rome. The trial court dismissed this claim based upon this court's en banc decision in *Beasley v. Beasley,* 359 Pa.Super. 20, 518 A.2d 545 (1986), *alloc. den.* 516 Pa. 631, 533 A.2d 90 (1987). The court noted that despite the controlling law, wife continually pressed this issue before the trial court.

In *Beasley,* this court held that contingent fees may not be considered to establish present value or goodwill of a law practice for the purpose of equitable distribution in a divorce proceeding, nor may they be considered for the purpose of establishing a basis for alimony awards since they are unascertainable earnings. *Beasley,* 359 Pa.Super. at 41, 518 A.2d at 555.

> Contingent fees, while having a degree of similarity to pensions, do not have the same expectation of vesting which permits greater certainty in fixing value and for establishing present worth. Of course, in those cases wherein the professional is paid for services performed, a clear appraisal of the value of uncompensated work in progress can be made upon which a determination of marital property and division of that property can be based. This can be ascertained through bookkeeping records, which do not involve the evaluation of confidential files.... Unquestionably, lawyers cannot be carved out as a special category of professionals who are immune from evaluation as to present value, but to permit inquiry into confidential files for the

purpose of evaluating contingent fees as potential earnings is inappropriate.... [and] would have a chilling effect on [the confidential] relationship which far outweighs the need to appraise those files for [purposes of marital distribution].

*Id.* at 41, 42, 518 A.2d at 555, 556. Accordingly, even if contingent fee cases originating from Blank, Rome were marital assets, no valuation could be determined. Accepting wife's argument that husband took with him from Blank, Rome "an inventory of over one thousand cases," there is, as *Beasley* points out, the compelling issue of the attorney-client confidential relationship which precludes review of the files and the additional consideration that there exists only an expectation that the interest will vest and, consequently, a tenuous basis for evaluation. *Id.* at 41, 518 A.2d at 555; *see also Hodge v. Hodge,* 513 Pa. 264, 269, 520 A.2d 15, 17 (1986) (future income is not marital property because it has not been acquired during the marriage). There are additional complications. There is the question of what amount, assuming the interests vest, is payable to Blank, Rome on the basis of *quantum meruit.* Finally, the value of these cases is, to a considerable but unascertainable extent, directly related to the professional reputation of Attorney Perlberger. As stated in *Beasley,* "when a sole proprietorship terminates ..., the lights go out, the value of the sole proprietorship is extinguished and not transferrable." *Beasley,* 359 Pa.Super. at 39, 518 A.2d at 552. *See Fexa v. Fexa,* 396 Pa.Super. 481, 485, 578 A.2d 1314, 1316 (1990); *cf. Butler v. Butler,* 423 Pa.Super. 530, 621 A.2d 659 (1992) (husband's practice could not be equated with a sole proprietorship as in *Beasley* )).

The trial court, having considered all of these factors, properly excluded the contingent fee cases from the marital estate. We find no abuse of discretion. *Ruth, supra.*

## II.

Wife next argues that the trial court improperly precluded her from discovery of the books and records of PLA and that this prevented her from properly valuing husband's law firm.

The 1988 amendments to the Divorce Code [18] liberalized discovery in divorce proceedings. Discovery under the

18. 1988, Feb. 12, P.L. 66, No. 13, § 3.

amended provisions of the Divorce is no longer limited to interrogatories.[19] The amendment, adopted without discussion or debate in the House or the Senate, allows discovery "as provided for all other civil actions under the Pennsylvania Rules of Civil Procedure." 23 Pa.C.S. § 3505. The scope of discovery in divorce proceedings is now defined in Pennsylvania Rule of Civil Procedure 4003.1.[20] In 1989, however, by order of the Supreme Court of Pennsylvania, section 3505(c) was suspended.[21] *See* Pa.R.C.P. 1920.91(2) and note thereto. Discovery in actions in divorce or annulment of marriage is now prescribed by Pennsylvania Rule of Civil Procedure 1920.-22.

Wife argues that the trial court's orders limiting discovery precluded her from properly valuing PLA. She contends that *Beasley* expressly allows for discovery of PLA's "books and records." Our determination of the previous issue disposes of this claim. The trial court determined that equity did not warrant the inclusion of PLA into the marital assets, *Flynn, supra,* and we have determined that the trial court did not abuse its discretion in this regard. *Ruth, supra.* Thus, we need not address this issue further.[22]

**19.** Prior to the 1988 amendments, discovery obtainable as of right was limited to interrogatories. The relevant rules of court provided:
Pa.R.C.P. 1920.22. Discovery
(a) Except as provided by subdivision (b), there shall be *no discovery* in an action of divorce or for annulment or a claim which has been joined as permitted under the Divorce Code *unless authorized by special order of court.*
(b) When a claim is made for alimony or the determination and distribution of property rights, any party may serve upon any other party as of course within such time as not to delay the trial *interrogatories* limited to those claims.
Pa.R.C.P. 1920.22(a), (b) (emphasis added).

**20. RULE 4003.1 SCOPE OF DISCOVERY GENERALLY. OPINIONS AND CONTENTIONS.**
(a) Subject to the provisions of Rules 4003.2 to 4003.5 inclusive and Rule 4011, a party may obtain discovery regarding any matter, not · privileged, which is relevant to the subject matter involved in the pending action, ...
Pa.R.C.P. 4003.1.

**21.** February 7, 1989, effective July 1, 1989.

**22.** We do note that our review of the record indicates that the trial court allowed for liberal discovery; the stream of pleadings and the volumes of testimony in this case are a testament to the extraordinary amount of information amassed by both parties in this case. Husband

## III.

 In her fourth issue, wife argues that the trial court erred in concluding that certain monies from the Provident Bank Accounts, accounts # 869–311–0 and # 450–336–8, were traced to the Merrill Lynch Account. Wife agrees with the trial court's determination that these funds were marital property, but disagrees with the finding that the value was traced to the Merrill Lynch Account. Wife contends, therefore, that she was denied her rightful distribution.

The court found that the amount of the two Provident Bank accounts, $117,254.00, was traced to the Merrill Lynch Account; in the distribution order, each party was awarded one-half of that amount, $58,627.00. The record indicates that the funds from the two Provident accounts originated from marital property, the Blank, Rome distribution, and were thereafter traced to the Merrill Lynch Account. The court's findings are supported by credible evidence in the record. *Campbell, supra.* We, therefore, find no abuse of discretion. *Barnhart, supra.*

was deposed on May 19, 1989. On April 23, 1990 he filed an income and expense statement, as well as an inventory and appraisement of all marital and non-marital assets and liabilities. Pursuant to subpoena duces tecum, husband was ordered to produce various documents, including, *inter alia:* husband's hourly rate and weekly average pay since PLA's inception; husband's benefits, including bonuses, expense accounts, vehicles, credit cards, entertainment and travel; all agreements with Blank, Rome regarding severance; list or documents reflecting monthly payments to Blank Rome; copies of letters from IRS regarding deficiencies, penalties, taxes, and interest on any returns from 1981 to present [1990]; brokerage statements and accounts; brokerage statements for investments held for the period 1986 to present [1990]; statements of stock, securities, bonds, mortgages and other investments; credit card statements, including PLA credit cards; statements for money markets and all other accounts held individually or with Diane Strausser (husband's paramour) from 1986 to present [1990]; copies of all bank statements held individually or with any other person, including checks and deposits, from 1986 to present [1990]. Wife also deposed Larry Haft, Esq., prior shareholder and employee of PLA; Lois Robinson, the financial administrator of PLA; Diane Strausser, PLA's office administrator; and Daniel Jones, CPA, husband's individual and firm accountant.

## IV.

In her next claim, wife argues that the trial court erred in exercising jurisdiction over the husband's petition to restore funds to the children's accounts. The children's accounts were opened pursuant to the Pennsylvania Uniform Gift to Minors Act [PUGMA accounts]. 20 Pa.C.S. § 5301 *et seq.*

Wife argues that the orphan's court has exclusive jurisdiction over the PUGMA accounts and therefore Judge Subers improperly ordered wife to reimburse certain monies she had withdrawn from the PUGMA accounts.

Section 3104 of the Divorce Code provides in relevant part:

**§ 3104. Bases of jurisdiction.**

**(a) Jurisdiction.**—The courts shall have original jurisdiction in cases of divorce ... and shall determine, in conjunction with any decree granting a divorce ..., the following matters, if raised in the pleadings, and issue appropriate decrees or orders with reference thereto, and may retain continuing jurisdiction thereof:

\* \* \* \* \* \*

(3) Any support or assistance which shall be paid for the benefit of any children of the marriage ...;

\* \* \* \* \* \*

(5) Any other matters pertaining to the marriage and divorce ... which fairly and expeditiously may be determined an disposed of in such action.

23 Pa.C.S. § 3104(a)(3) & (5). The Divorce Code establishes "a comprehensive scheme for the dissolution of marriage, the distribution of marital property and the resolution of *related economic claims.*" *Reese v. Reese,* 351 Pa.Super. 521, 525–526, 506 A.2d 471, 4763 (1986) (quoting *Bacchetta v. Bacchetta,* 498 Pa. 227, 235, 445 A.2d 1194, 1198 (1982) (emphasis added) (footnote omitted)); *see also Geraghty v. Geraghty,* 411 Pa.Super. 53, 59–60, 600 A.2d 1261, 1263 (1991) (determination of any economic or similar claims which are ancillary to a divorce action must be made in conjunction with or following the entry

of a divorce decree). The use of the PUGMA funds here is clearly related to the divorce and associated economic claims and could "fairly and expeditiously" be disposed of with the underlying action. 23 Pa.C.S. § 3104(a)(5). *Cf. Sutliff v. Sutliff*, 515 Pa. 393, 402, 528 A.2d 1318, 1322 (1987) (court of common pleas lacked jurisdiction over claim relating to Uniform Gift to Minors Act funds because appeal was pending, citing Pa.R.A.P. 1701). The court of common pleas properly exercised ancillary jurisdiction.

## V.

Wife also argues that the trial court abused its discretion in ordering wife to restore $52,750.00 to the PUGMA accounts. The trial court found that after the Perlbergers separated, wife withdrew approximately $76,000.00[23] from these accounts, using the funds as follows:

| | |
|---|---|
| Tennis lessons, piano lessons, Math & Chemistry tutoring | $ 6,000.00 |
| Payment of children's taxes | $ 1,000.00 |
| Swimming pool expenses | $ 1,500.00 |
| Family trips (Washington, D.C.) | $ 4,500.00 |
| Condominium expenses (vacation home—Margate, NJ) | $ 30,000.00 |
| Entertainment | $ 6,000.00 |
| Legal Representation in Custody Matters | $ 5,000.00 |
| Medical bills | $ 2,550.00 |
| Medicine | $ 500.00 |
| Child Care | $ 5,000.00 |
| Food | $ 5,000.00 |
| Therapy (wife) | $ 750.00 |

Wife was ordered to restore $52,750 to the children's accounts, the amount which the court determined had been spent on nonessentials. In its conclusions of law, the court stated that "Wife improperly depleted the children's Pa. Uniform Gift to

---

**23.** We are not certain how the trial court determined that wife had withdrawn approximately $76,000.00; the expenses listed total only $67,800.00. Neither of the parties recognized this discrepancy, nor did they point out the $8,000.00 error in the court's distribution order to husband.

Minor's Accounts by expending funds for non-necessities such as family trips ... condominium expenses ... child care ... entertainment ... pool expenses ... legal representation in custody matters ... child care ... and wife's therapy."

Wife contends that the trial court utilized the incorrect standard when it assessed whether to order reimbursement based upon a determination of whether the expense was a necessity. Wife contends the correct standard is whether the expenses were for the *benefit of the minor* and relies upon section 5305(b) of the Pennsylvania Uniform Gift to Minors Act:

> **(b)** The custodian shall pay over to the minor for expenditure by him or expend for the minor's benefit so much of or all the custodial property *as the custodian deems advisable for the support, maintenance, education and benefit of the minor, in the manner, at the time or times, and to the extent that the custodian, in his discretion, deems suitable and proper,* with or without court order, with or without regard to the duty of himself or of any other person to support the minor, or his ability to do so, and with or without regard to any other income or property of the minor, which may be applicable or available for any such purpose.

20 Pa.C.S. § 5305(b).

 Assets transferred to a child by a parent pursuant to the Pennsylvania Uniform Gift to Minors Act belong to the child as a result of a completed gift. *See Flory v. Flory,* 364 Pa.Super. 67, 527 A.2d 155 (1987). The minor is vested with full and indefeasible title. 20 Pa.C.S. § 5305(a). In *Sutliff,* the Pennsylvania Supreme Court explained that, unlike a trust which must be used for a stated purpose, PUGMA property and proceeds may generally be used by custodians for the support of the child. *Id.* at 404, 528 A.2d at 1323. "It is, however, the custodian's duty to use the [P]UGMA property *for the child's benefit.* 20 Pa.C.S. § 5305(b). We have stated that a custodian may not use [P]UGMA property to benefit

himself, ... and suggested that a custodian *may not use it to fulfill an existing support obligation." Id.* (emphasis added).

In *Sutliff,* a plurality of the Supreme Court of Pennsylvania held that a parent's support obligation is independent of a minor's assets and, where he or she reasonably can do so, the parent must support the child without regard to PUGMA assets. *Sutliff,* 515 Pa. at 405, 528 A.2d at 1324. Although *Sutliff* addressed the issue of a support obligor's use of PUGMA assets to fund a portion of his support obligation, we find that the principles espoused by our Supreme Court are both instructive and applicable here, where wife, though not a support obligor, is subject to the general duty to support her children. *See Com. v. Mexal,* 201 Pa.Super. 457, 193 A.2d 680 (1963) (the obligation to support minor children is "well nigh absolute."); *see also Conway v. Dana,* 456 Pa. 536, 318 A.2d 324 (1974) (pursuant to Pennsylvania's Equal Rights Amendment, both parents have a duty to support their children, even if it causes them hardship).

*Sutliff* prohibits a parent/custodian from invading the custodial assets "to fulfill a parent's support obligation where the parent has sufficient means to discharge it himself." *Id.* at 398, 528 A.2d at 1320. It does not, however, bar absolutely a custodian's use of the funds in relation to a support obligation, court ordered or otherwise. The Pennsylvania Supreme Court set forth the following as a guide for the trial courts in determining the effect of PUGMA assets on a support obligation:

Whether it is reasonable to require a [parent] to supply all or part of the support [the] children require without regard to their own means is a threshold question. It involves balancing the parent's income, assets, earning power and needs against the children's needs. If the court determines that the parent can reasonably provide for their needs at an appropriate level, that obligation is paramount and the children's means should not be considered. The inquiry should thereafter deal only with the children's *reasonable*

*requirements,* with a possible exception for children seeking higher education.

*Sutliff,* 515 Pa. at 405, 528 A.2d at 1324 (emphasis added).

▮ With respect to the duties of a custodian, *Sutliff* set forth the following principles:

Indeed, a custodian's duties may be more properly analogous to those of a trustee with *the broadest discretionary powers....* [However, e]ven if a parent lacks the resources to fully provide for his children's needs, no court should grant him or her the unbridled right to pay as much of the children's support from [P]UGMA funds as he or she sees fit.

*Id.* at 404, 528 A.2d at 1324 (emphasis added). In summary, the custodian has broad but not unbridled discretion to use the custodial assets for the benefit of the minor; the parental obligation of support without regard to custodial assets, however, remains paramount. Additionally, a parent is required to sacrifice personal luxuries to provide his or her children with their needs. *Conway v. Dana,* 456 Pa. 536, 318 A.2d 324 (1974). Both parents must "appropriately expend their resources before turning to the custodial funds." *Id.*

▮ Wife maintains that she utilized custodial funds in the good faith belief that her expenditures were for the benefit of the children. The substance of this argument is that her judgment as to what is in the children's benefit, whether physical, emotional, social, or intellectual, should not be second-guessed. We agree. Wife has devoted the past twenty years to caring for her children; she is the expert on what her children's needs are. The determining factor, however, is *reasonableness. Sutliff,* 515 Pa. at 405, 528 A.2d at 1324.

What qualifies as a reasonable need for the benefit of a child and what qualifies as a luxury is a question of fact based upon the particular circumstances presented. The economic status and lifestyle to which the children are accustomed is relevant and critical to this inquiry.

■ Mrs. Perlberger was the wife of a reputable attorney with a considerable income. During the marriage, husband's income increased and the Perlbergers accumulated substantial assets. Neither party spared expenses in providing for their children. When husband left the marital home, wife was limited to spousal support payment of $565.00 per week and child support payments of $701.00 per week, approximately $60,000 per year to run her household and care for her children. Though not a sympathetic position, wife and her children were accustomed to a comfortable and secure lifestyle. Wife explained on the record the specific uses to which the PUGMA funds were put. She may not have been frugal during the pendency of this action, but she is not necessarily required to alter her children's lifestyle. *See Commonwealth ex rel. Goichman v. Goichman,* 226 Pa.Super. 311, 316 A.2d 653 (1973).

When children are attempting to adjust to the collapse of their family, a parent's attempt to limit major adjustments in other areas of the children's lives may provide a measure of stability. During the Perlbergers' separation and divorce proceedings, the children may in fact have benefitted from trips to Washington, D.C. to visit relatives, or vacations and summers with friends at the beach house. If economically feasible, whatever aspects of the children's lives that can remain stable, should. The uses to which wife put the custodial assets she borrowed may be extravagant to one of conservative means or taste, but we cannot conclude from the sparse record on this issue that wife's actions were neither reasonable nor for the benefit of the children.

We do not dispute that certain expenditures were an invasion of the custodial assets and clearly were not used for the children's benefit, i.e., wife's therapy or legal fees.[24] Nonetheless, we are in agreement with wife's argument that the trial court imposed its own standard in ordering reimbursement to the accounts. Further, on each point we are presented only

24. Husband apparently disagrees entirely with the breakdown of expenditures. In his brief he states: "It is asserted that at least $52,500 went to pay [wife's] retainer at the Sprague office and clearly $5,000 went to Lynne Gold–Bikin, Esquire."

with the wife's testimony as to the use of the funds and the trial court's summary conclusions that certain expenses were non-essentials.

We are particularly concerned with the $30,000.00 which was used to pay the mortgage and condominium expenses for the vacation home in Margate, New Jersey.[25] The vacation home was marital property. Wife testified that she paid the mortgage, fees and expenses to maintain the vacation home during the parties' separation. Husband does not dispute that during the parties' separation and divorce proceedings wife maintained the mortgage, fees and expenses for the vacation home. Further, in its distribution order the court awarded each party 50% of the proceeds of sale.

The record here is also problematic; our searching review of the references to the record given us by the trial court and the parties on this matter reveal very little, certainly not enough to efficiently or judiciously determine this matter. We are unable to discern whether wife appropriately expended her own resources before resorting to the custodial funds. *Conway, supra; Sutliff, supra.* A record must be made with respect to these matters. Determinations with respect to the reasonableness of the expenditures for the children's benefit must also be documented, keeping in mind the correct standards under the statute and the limited case law on this issue. 20 Pa.C.S. § 5305(b); *Sutliff, supra.* We, therefore, vacate that portion of Judge Suber's order requiring wife to reimburse the PUGMA accounts. We remand for a hearing confined to this issue and instruct the trial court to proceed according to the principles and standards set forth above.[26]

## VI.

In her next claim, wife argues that the court erred in determining that she did not request alimony pendente lite.

25. Husband testified that he paid the mortgage on the vacation home until November of 1987—for six months after separation.

26. The timely disposition of this matter would benefit the Perlberger children, financially and otherwise, and we are admittedly reluctant to prolong the litigation in this case. It is up to the parties, in the interests of the children, to expedite the resolution of this matter.

Alimony pendente lite is maintenance "pending litigation," and is payable only during the pendency of a divorce proceeding. *Heilbron v. Heilbron,* 158 Pa. 297, 27 A. 967 (1893); *Horn v. Horn,* 388 Pa.Super. 46, 564 A.2d 995 (1989); *see also Purdue v. Purdue,* 398 Pa.Super. 228, 580 A.2d 1146 (1990) (alimony pendente lite is designed to enable dependent spouse to maintain or defend litigation until all economic issues are resolved); *cf. Krakovsky v. Krakovsky,* 400 Pa.Super. 260, 583 A.2d 485 (1990) (in bifurcated divorce, alimony pendente lite may be awarded at party's request for period between entry of divorce decree and adjudication of economic claims).

The trial court's statement in its opinion—"We note that the Wife did not request alimony pendente lite ..."—is in error. In count V of her complaint, wife requested the court enter an award of spousal support and/or alimony pendente lite. *See* Pa.R.C.P. 1920.15. The trial court did, however, acknowledge that "[a]fter extensive hearing, it was clear to this court that Wife was entitled to spousal support." Wife, therefore, is correct that she did not waive this issue, however, she failed to present an argument in her brief on this claim.[27] Counsel has wasted time and resources in presenting statements, disguised as appellate arguments, which require this court to guess at the relief requested.

## VII.

Next, wife argues that the court erred in its award of alimony, spousal support and child support.

*Alimony*

 Alimony is based upon reasonable needs in accordance with the lifestyle and standard of living established by the parties during the marriage, as well as the payor's ability

---

**27.** We note that the difference between the amount of spousal support and alimony pendente lite is usually minimal or nonexistent. Here, the trial court entered a spousal support order retroactive to the date requested, November 10, 1987, and, on October 21, 1991, entered an award of alimony along with the entry of the divorce decree. This was not a bifurcated action where the conversion of spousal support to alimony pendente lite was necessary or relevant. *Krakovsky, supra; Purdue, supra.*

to pay. *McCabe v. McCabe*, 374 Pa.Super. 451, 543 A.2d 558 (1988); *Dyer v. Dyer*, 370 Pa.Super. 377, 536 A.2d 453 (1988). In determining the nature, amount and duration of alimony, the court shall consider:

the relative earnings and earning capacities of the parties; the ages and the physical, mental and emotional conditions of the parties; the sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits; the expectancies and inheritances of the parties; the duration of the marriage; the contribution by one party to the education, training or increased earning power of the other party; the extent to which the earning power, expenses or financial obligations of a party will be affected by reason of serving as the custodian of a minor child; the standard of living established by the parties during the marriage; the relative education of the parties and the time necessary to acquire sufficient education or training to enable the party seeking alimony to find appropriate employment; the relative assets and liabilities of the parties; the property brought to the marriage by either party; the contribution of a spouse as homemaker; the relative needs of the parties; the marital misconduct of either of the parties during the marriage (post-separation misconduct specifically excluded); tax ramifications of the alimony award; and whether the requesting party lacks sufficient property, including property from the equitable distribution award, to provide for the party's reasonable needs.

23 Pa.C.S. § 3701(b)(1)–(14). Wife first argues that the court erred in determining that she possessed an earning capacity of $30,000.00 per year. The trial court made this finding based upon the testimony of Dr. Sally Kneipp, a vocational expert. Dr. Kneipp performed a comprehensive vocational evaluation of Mrs. Perlberger. In Dr. Kneipp's opinion, Mrs. Perlberger was, on the basis of this evaluation and her educational background, immediately employable as a high school or university level French teacher. Dr. Kneipp cited as an example an open position for a French teacher at Germantown Acade-

my in Fort Washington, Pennsylvania. That position paid approximately $31,500.00 per year. The trial court found this testimony credible. The court found not credible the testimony of wife's experts with respect to her deteriorating eyesight, concluding, therefore, that wife's argument that she in fact had no earning capacity was unfounded. We will not usurp the trial court's duty as factfinder. The record contains credible evidence to support this finding. We, therefore, are bound by this determination. *See Barnhart, supra; see also Campbell, supra.*

The trial court's alimony order extends for a period of ten years. As we stated above, *see supra,* note 8, the youngest child, in second grade at the time of the order, should be completing her senior year in high school when alimony payments cease. The alimony order, therefore, allows wife to choose not to work outside the home while the youngest child completes her primary and secondary school education. The alimony payments over a period of one year equal $30,420.00 ($585.00 × 52), approximating the court's determination of the wife's annual earning capacity.

Wife also argues that husband intentionally reduced his income in order to reduce the amount of the award. Following the parties' separation, husband left a prestigious law firm, earning approximately $300,000 per year, to launch his own law firm. At the time of hearing, the court determined that husband was earning approximately $165,000 per year.

Courts traditionally view with suspicion any sudden reduction in income. A party cannot reduce earnings in an attempt to reduce support payments. *Snively v. Snively,* 206 Pa.Super. 278, 212 A.2d 905 (1965). In *Weiser v. Weiser,* 238 Pa.Super. 488, 362 A.2d 287 (1976), husband, a patent attorney in a law firm, had accustomed his family to a lifestyle based on an income of $40,000 per year. Shortly before he and his wife separated, he left the firm to establish his own practice, eventually forming his partnership with two other attorneys. This resulted in the reduction of his income by more than one-

half. The trial court ordered husband to pay a sum of $150 per week for the support of his wife and three children.

On appeal to this court, wife's counsel argued successfully for an increase in the weekly support payment. We held:

[Husband's] change in employment resulted in an income reduction of more than one half. It is also a fact that as a partner in [his] law firm he could control the draw and his weekly income of $340 may not accurately reflect his new earnings. It is for these reasons that we feel the award is inadequate. Most certainly he has the right to establish his own business but not at the expense of his family whose life style he created based on $40,000.00 per year income which now must be changed to meet the new conditions while he continues to enjoy his usual high standard.

*Id.* at 495, 362 A.2d at 290. The circumstances here are similar to the facts in *Weiser.* Husband left Blank, Rome thirteen months after separation to open his own law firm. As a result of establishing his own firm, husband's income was reduced by approximately one-half.

However, the record here, unlike that presented in *Weiser*, supports the trial court's finding that husband "did not leave his partnership with a purpose of reducing his income so that he could pay less support, but rather that he had valid motives for leaving and establishing his own law firm." Furthermore, the instant case, in contrast to *Weiser*, presents a variety of additional considerations which cannot be severed from the alimony determination. We have considered the husband's child support obligation of approximately $33,000 per year, husband's obligation to provide approximately $24,000 per year for the oldest child's college expenses,[28] husband's obligation to maintain life insurance totalling $300,000 for his children until each child reaches the age of twenty-three, as well as the award to wife of two-thirds of the marital estate. The disparity in the parties' earning capacities is sufficiently offset by husband's financial obligations to his three children.

28. Husband also has a daughter from a prior marriage for whom he pays college expenses.

*See* 23 Pa.C.S. § 3701(b)(7). Finding no clear abuse of discretion in the award of alimony, we will defer to the trial court's order. *Ruth v. Ruth,* 316 Pa.Super. 282, 462 A.2d 1351 (1983).

*Spousal Support & Child Support*

██ Wife claims the trial court abused its discretion in its awards of spousal support and child support. As in the alimony claim, we are bound by the trial court's award of child support and spousal support unless the circumstances suggest an abuse of discretion. *See Goodman v. Goodman,* 375 Pa.Super. 504, 544 A.2d 1033 (1988) (spousal support); *Ritter v. Ritter,* 359 Pa.Super. 12, 518 A.2d 319 (1986) (child support).

██ In support of her claims, wife presents the same arguments refuted above, namely that the court erred in finding that husband did not intentionally reduce his income and that the court erred in assessing an earning capacity for wife. *See Goichman, supra; see also Akers v. Akers,* 373 Pa.Super. 1, 540 A.2d 269 (1988). Having determined that the trial court's findings are supported by credible evidence, and having resolved these arguments against wife in her alimony claim, wife's claims that the trial court abused its discretion in its award of child support and spousal support must likewise fail. *Campbell, supra; Barnhart, supra.*

## VIII.

██ Wife also argues that the trial court erred in precluding discovery of and evidence of husband's earning capacity based on compensation derived from completed asbestos cases. Wife argues that she sought to obtain through discovery information on husband's settled asbestos cases, i.e., the amount of each settlement as to each defendant, the number of defendants, the injury, the age, employment history and smoking history of the plaintiff, and other relevant information. The wife requested this information in order to project husband's earning capacity *"from his remaining inventory of cases."* Appellant's brief, p. 48. (emphasis added).

The trial court denied this request based on the *Beasley* ruling. Wife contends this was error because none of the

information she sought was the type of confidential information precluded by *Beasley.* She relies on the following language:

> It is tenuous and risky to attempt to evaluate the likely return on contingent fees and as such, no value can be placed on them for purposes of equitable distribution. However, the Divorce Code is flexible and in this respect, the income producing capacity reflected by such cases can be estimated on the basis of compensation for completed cases and, therefore, that record should be sufficient to project the earning capacity of the attorney without speculating on the nebulous return that might be derived from examining active contingent fee cases.

*Beasley,* 359 Pa.Super. at 39, 518 A.2d at 554.

For purposes of support, alimony and equitable distribution, earning capacity is one of the many considerations the trial court must evaluate before rendering its order. *See* 23 Pa. C.S. § 3502(a)(5); 3701(b)(1); 4322(a); *see also Myers v. Myers,* 405 Pa.Super. 290, 592 A.2d 339 (1991) (when determining support obligation of a spouse, the trial court must consider income, potential earning capacity and other property and financial resources); *Goodman v. Goodman,* 375 Pa.Super. 504, 544 A.2d 1033 (1988). A person's earning capacity is defined "not as an amount which the person could theoretically earn, but as that amount which the person could realistically earn under the circumstances, considering his or her age, health, mental and physical condition and training." *Myers,* 405 Pa.Super. at 297, 592 A.2d at 343, citing *Goodman, supra,* 375 Pa.Super. at 508, 544 A.2d at 1035. *See also Simpson v. Simpson,* 287 Pa.Super. 356, 430 A.2d 323 (1981).

Here, the trial court assessed husband's earning capacity at $165,000.00 per year; this was done without the evaluation of any PLA client files. The trial court relied principally upon tax returns and the expert testimony of various accountants in order to reach this figure. The trial court also had before it fees generated from asbestos cases in the past, forwarding fees to Blank, Rome and referral counsel, net fees (reflected in tax returns), balance sheets and audit result.

The hearing court has wide discretion in discovery matters as well as in determining the proper amount of support or alimony, or the distribution of the marital estate. As we have stated above, the trial court gave wife significant latitude in discovering the corporate records and financial statements of PLA. Although we are of the opinion that wife's discovery request did fall within the parameters of allowable discovery under *Beasley,* we cannot, on this alone, conclude that the trial court abused its discretion in its determination of husband's earning capacity. The court had before it sufficient information, in particular historical information with respect to fees generated in asbestos cases, to make this determination.

## IX.

In her final claim, wife argues that the trial court erred in denying counsel fees. We will reverse a determination of counsel fees and costs only for an abuse of discretion. *Williamson v. Williamson,* 402 Pa.Super. 276, 586 A.2d 967 (1991). The purpose of an award of counsel fees is to promote fair administration of justice by enabling the dependent spouse to maintain or defend the divorce action without being placed at a financial disadvantage; the parties must be "on par" with one another. *Johnson v. Johnson,* 365 Pa.Super. 409, 529 A.2d 1123 (1987), *appeal denied* 517 Pa. 623, 538 A.2d 877 (1988); *Cox v. Cox,* 187 Pa.Super. 177, 144 A.2d 458 (1958); *see also White v. White,* 382 Pa.Super. 478, 555 A.2d 1299 (1989).

Wife's opposing party is a prominent figure in domestic relations; he is a teacher in the field and has authored and co-authored treatises on the 1980 Divorce Code and on family law in the Commonwealth. When the parties sought counsel, it is not surprising that wife felt the need for strong support behind her in order to be "on par" with husband. *Johnson, supra.* It is counsel, however, who are responsible for tempering any imbalance and for upholding professional obligations, both to the client and to the court. *See* Rules of Professional Conduct 1.5, 3.1, 3.3.

Wife's counsel apparently engaged in time-consuming pursuit of an issue involving settled law, wasting the court's resources as well as those of the client. The trial court performed a comprehensive review of the attorneys' billing sheets, finding the presence of two or three attorneys at particular hearings and the duplication of work "excessive." The court also found that wife's counsel continually raised the issue of the valuation of PLA's contingent fee cases despite the controlling law on the matter. The court, in sum, found the fees to be "grossly excessive."

> [One] firm alone has billed for $283,000 in fees plus $44,955 for costs.... In reviewing the bills, it is obvious that they are void of sufficient indications of services actually performed. Conferences or telephone calls in many cases did not indicate either the subject or the person called, research does not show what was being researched, preparation of memoranda of law does not show the subject matter of the memoranda of law.... [T]he fees are grossly excessive when you compare them against the amount of the work performed, the *character* of the *services rendered*, the difficulty of the problems involved, the importance of the litigation, the amount of money or value of property in question, and the ability of the client to pay a reasonable fee for services rendered.

 Counsel fees are awarded based on the facts of each case after a review of all the relevant factors. These factors include the payor's ability to pay, the requesting party's financial resources, the value of the services rendered, and the property received in equitable distribution. *See Bold v. Bold,* 524 Pa. 487, 574 A.2d 552 (1990), *remanding* 374 Pa.Super. 317, 542 A.2d 1374 (1988) *on other grounds; Lawrence v. Lawrence,* 347 Pa.Super. 57, 500 A.2d 154 (1985); *Dech v. Dech,* 342 Pa.Super. 17, 492 A.2d 41 (1985); *Jack v. Jack,* 253 Pa.Super. 538, 385 A.2d 469 (1978); *See also Adelstein, supra* (distribution of property was sufficient to require both spouses to pay their own legal fees); *Compare Nuttall v. Nuttall,* 386 Pa.Super. 148, 562 A.2d 841 (1989) (after acknowledging protracted litigation and fact that appellee gave no reasonable

explanation for not returning to work one year and a half after the divorce, the court, nonetheless, proceeded to consider the disparity of the parties' earnings and their respective abilities to pay and awarded appellee partial counsel fees) *with Ganong v. Ganong*, 355 Pa.Super. 483, 513 A.2d 1024 (1986) (three-to-one disparity of parties' incomes did not require that trial court award wife counsel fees).

In most cases, each party's financial considerations will ultimately dictate whether an award of counsel fees is appropriate. *See Diamond v. Diamond*, 360 Pa.Super. 101, 519 A.2d 1012 (1987); *see also Nuttall*, 386 Pa.Super. at 163–64, 562 A.2d at 848 (Beck, J., concurring). *Cf. Lawrence v. Lawrence*, 347 Pa.Super. 57, 500 A.2d 154 (1985) (it is not legally relevant nor permissible to consider which party brought the action when awarding counsel fees in a divorce action). The court, however, may consider "discrepancies in counsel's statement of account." *Gioia v. Gioia*, 382 Pa.Super. 538, 550, 555 A.2d 1330, 1337 (1989).

Here, the court considered all of the relevant factors, including wife's distribution award, the support payments husband had made for four and one-half years while the litigation continued, the fact that wife had already paid her attorneys $175,000.00, and the fact that wife's testimony that she had borrowed money from friends in order to pay her attorneys was not credible. The court, however, placed particular emphasis on the discrepancies in counsel's statement of account. Under the circumstances present in this case, we do not find the court's order denying counsel fees to be an abuse of discretion. *Williamson, supra; Gioia, supra.*

In conclusion, we affirm Judge Subers's order entering a final decree and distributing the marital property. We vacate that portion of the order pertaining to wife's withdrawal of PUGMA funds and we vacate and remand on that issue in accordance with this opinion.

Affirmed in part; vacated and remanded in part. Jurisdiction relinquished.

KELLY, J., filed a concurring and dissenting opinion.

KELLY, Judge, concurring and dissenting:

I agree with much of the majority's discussion. However, in order to effectuate economic justice between the parties, I find merit in several of Wife's arguments, and therefore, I would grant at least partial appellate relief.

I am particularly concerned that the trial court restricted Wife's pre-trial discovery which would have led to a more accurate depiction of Husband's earning capacity. The court ordered alimony without considering whether Husband could have afforded a higher award, and the trial court failed to consider Wife's former standard of living. The court also did not adequately consider the parties' children's prior standard of living. Accordingly, I would reverse the trial court's order to the extent it relates to alimony, spousal support, and child support.

I also believe that there is sufficient evidence of record for this Court to hold that Wife need not replenish her children's gift accounts. Finally, I would reverse the trial court's order denying Wife counsel fees.

### Discovery as to Husband's Earning Capacity

Wife argues that the trial court erred by not permitting her to conduct discovery which would have aided in determining the value of Husband's new sole proprietorship, Perlberger Law Associates. Wife maintains that many of the cases on which Perlberger Law Associates has been retained are asbestos cases which can be traced to Husband's ex-partnership in Blank, Rome, Comisky & McCauley, a marital asset. I agree that Wife was entitled to review completed cases, but not open cases, in order to project Husband's earning capacity. With the power to investigate the completed asbestos cases, Wife could have further enlightened the court with regard to Husband's future earning capacity.

"Although marital property is identified at the date of separation, the value of the property is determined at the date of distribution." *Butler v. Butler*, 423 Pa.Super. 530, 539, 621 A.2d 659, 664 (1993), citing *Adelstein v. Adelstein*, 381 Pa.Su-

per. 221, 553 A.2d 436 (1989) and *Sutliff v. Sutliff,* 518 Pa. 378, 543 A.2d 534 (1988). Marital property includes all property, unless specifically excepted by statute, acquired during the marriage. 23 Pa.C.S.A. § 3501(a). A partnership interest in a professional firm is marital property. *See Buckl v. Buckl,* 373 Pa.Super. 521, 542 A.2d 65 (1988) (*en banc* ) (plurality).

In the instant case, Husband was a partner at Blank, Rome, Comisky & McCauley for several years. On the date of separation, May 4, 1987, Husband was still a partner there. He did not leave that firm until one year later, in May of 1988. Therefore, his partnership at Blank, Rome, Comisky & McCauley was marital property. The issue is how much value that partnership had.

The Pennsylvania Supreme Court has stated that the primary factor to be considered in determining a partner's interest in a law firm is the partnership agreement. *McCabe v. McCabe,* 525 Pa. 25, 575 A.2d 87 (1990). In *McCabe,* the partnership agreement restricted partners who left the partnership from realizing anything more than the balance of the partner's capital account. In that case, the agreement precluded the husband from removing work in progress and other accounts which could determine a "going concern" value. The court emphasized that the rule of law in *McCabe* would not be applicable to all partnership interests:

> It is to be recognized that partners in certain other law firms may possess greater rights upon withdrawal from their firms than do the partners at Rawle & Henderson. Some may be governed by partnership agreements that allow them to realize values corresponding to some or all of the elements that enter into the computation of a firm's value as a "going concern."

*Id.* at 30, 575 A.2d at 89.

In *Fexa v. Fexa,* 396 Pa.Super. 481, 578 A.2d 1314 (1990) (plurality), I opined:

> If the nature of the economic good will is purely personal to the professional spouse, it is not *alienable;* hence it cannot actually be realized and may not be included in the equita-

ble distribution. *Cf.* [*McCabe, supra; Ullom v. Ullom,* 384 Pa.Super. 514, 559 A.2d 555 (1989); *Beasley v. Beasley, supra; DeMasi v. DeMasi,* 366 Pa.Super. 19, 530 A.2d 871 (1987) ]. If, however, a portion of the economic good will is attributable separately to the corporation or business and can be realized by sale to another (by selling the enterprise in whole or in part, buy-in's and buy-out's included), then *to that extent,* there is good will value subject to equitable distribution. *McCabe; Ullom; Buckl.*

*Id.* 396 Pa.Super. at 487, 578 A.2d at 1317.

In addition to the partnership agreement, all other relevant information such as the partner's actual ability to remove work in progress or other value must be considered. *See id.* at 488, 578 A.2d at 1318 ("there may ... be difficulties in determining a credible value for the alienable/realizable good will; whether these difficulties are surmountable may vary with the peculiar facts of particular cases."). *Cf. Butler, supra* (although marital property is identified at time of separation, the value is ascertained later, at the time of distribution).

In the instant case, therefore, we are guided by Husband's partnership agreement and other relevant occurrences after the date of separation which are relevant to the value of Husband's partnership interest. The balance of Husband's capital account, when he left Blank, Rome, Comisky & McCauley, was $243,652.35. The trial court found that such amount was used by the parties to satisfy a joint tax obligation. Thus, that amount was no longer marital property available for distribution.[1]

Relying upon *Beasley v. Beasley,* 359 Pa.Super. 20, 518 A.2d 545 (1986), *allocatur denied,* 516 Pa. 631, 533 A.2d 90 (1987), the trial court also concluded that none of the value of Husband's sole proprietorship, whose existence perhaps depended upon cases taken from Blank, Rome, Comisky & McCauley, would be evaluated or considered as marital property. Wife argues that she should have been permitted to

1. *See Duff v. Duff,* 510 Pa. 251, 507 A.2d 371 (1986) (joint tax liability to be considered in calculation of marital property).

inspect at least the records of the fledgling firm's completed cases in order to project a value on all of the cases derived from Husband's former partnership. I agree to the extent such projected value could be relied upon to determine Husband's future earning capacity.

The value of Husband's partnership interest at Blank, Rome, Comisky & McCauley consisted of more than that available in his capital account. Pursuant to an understanding with that firm, Husband was permitted to take to his new firm over *one thousand asbestos cases* which had not as yet been settled. Thus, unlike the situation in *McCabe, supra,* in the instant case, Husband actually was able to remove work in progress and realize value therefrom. Of course, any expense which Husband had to pay should be considered, but the value of those cases which followed Husband cannot be ignored in a divorce proceeding to determine future earning capacity.

Does *Beasley v. Beasley, supra* preclude any attempt at evaluating the worth of those one thousand asbestos cases to determine future earning capacity? I believe not.

The *en banc* Superior Court has held that cases which produce income based upon contingency fees may not be included as marital property for purposes of marital distribution because a calculation of the contingency would be too speculative. *Id.* at 38–39, 518 A.2d at 554. However, the court explained that the value of *completed contingency cases* could base a projection of the future earning capacity of the spouse who would receive income from the completion of the pending cases.

> [T]he Divorce Code is flexible and in this respect, the income producing capacity reflected by such cases can be estimated on the basis of compensation for completed cases and, therefore, that record should be sufficient to project the earning capacity of the attorney without speculating on the nebulous return that might be derived from examining active contingent fee cases. Permanent alimony, as support, is modifiable, and should the expectations vary either upward or downward, adjustments can be made by the

court in an expeditious and reasonable manner. For support, and recently for alimony, *earning capacity* has been one of the considerations upon which an award may be based.

*Id.* at 39, 518 A.2d at 554.

I agree with the majority that the trial court properly refrained from evaluating the one thousand pending asbestos cases for purposes of equitable distribution. However, pursuant to *Beasley*, I believe that Wife should have been permitted to research the asbestos cases *which had already been settled.*[2] As we opined in *Beasley*, such an investigation would be sufficient to project Husband's future earning capacity. While the majority and the trial court in this case acknowledge that the earning capacity calculation was based upon, in part, Husband's and his firm's tax records and the firm's large case load, I believe that a full advocative discovery into completed cases would have allowed for a more accurate evaluation of Husband's earning capacity, and thus, a more accurate alimony calculation.

### *Alimony, Spousal Support, and Child Support*

Wife argues that the trial court erred in awarding her an inadequate amount of alimony, spousal support, and child support. Wife suggests that the trial court wrongfully attributed to her a $30,000.00 per year earning capacity. Although I have serious questions as to the accuracy of the expert opinion which concluded that Wife has such an earning capacity, I recognize that the trial court was entitled to believe that version. Moreover, this Court is without the power to reverse the trial court's finding which was based on evidence of record. *O'Callaghan v. O'Callaghan,* 530 Pa. 176, 607 A.2d 735 (1992). Wife also cites as erroneous the trial court's failure to consider the Wife's and children's standard of living during the marriage. On this count, I agree and would award appellate relief.

**2.** The discussion of *Beasley* certainly makes the settled asbestos cases relevant and therefore discoverable. *See* 23 Pa.C.S.A. § 3505; Pa. R.Civ.P. 4003.1.

In fashioning an alimony award, the trial court must consider the several factors enumerated in 23 Pa.C.S.A. § 3701(b).

The determination of the amount to be awarded, whether of alimony or alimony pendente lite, rests in the sound discretion of the trial court. Absent an abuse of that discretion, an appellate court will not disturb the trial court's award. In the context of such determinations, the proper employment of judicial discretion includes the mandate to apply the Divorce Code in a compassionate and reasonable manner to effectuate the overriding goal of achieving economic justice between the parties.

*Schneeman v. Schneeman,* 420 Pa.Super. 65, 77, 615 A.2d 1369, 1378 (1992) (footnote omitted) (citations omitted).

In determining whether alimony is necessary, and in determining the nature, amount, duration and manner of payment of alimony, the court must consider numerous factors including the parties' earnings and earning capacities, income sources, mental and physical conditions, contributions to the earning power of the other, educations, standard of living during the marriage, the contribution of a spouse as homemaker and the duration of the marriage.

*Edelstein v. Edelstein,* 399 Pa.Super. 536, 540, 582 A.2d 1074, 1076 (1990), *allocatur denied,* 528 Pa. 611, 596 A.2d 157 (1991). Moreover, the court must state its reasons for the alimony award and for the amount of the award. 23 Pa.C.S.A. § 3701(d).

An important factor to consider in determining alimony is the standard of living to which the parties grew accustomed during their marriage. Of course, "[t]here is no absolute obligation on the part of a supporting spouse to see that the dependent spouse's life style remains unchanged from that enjoyed during the marriage." *Fexa v. Fexa, supra* 396 Pa.Super. at 490, 578 A.2d at 1319. While that duty is not absolute, the court should consider the prior standard of living. 23 Pa.C.S.A. § 3701(b)(8). *See also Edelstein v. Edelstein, supra; Pacella v. Pacella,* 342 Pa.Super. 178, 492 A.2d 707 (1985). And, *to the extent husband has the resources,* his duty is "to maintain his family's standard of living at a level

consistent with their station in life before the separation."
*Sutliff v. Sutliff,* 339 Pa.Super. 523, 555, 489 A.2d 764, 780
(1985), *affirmed,* 515 Pa. 393, 528 A.2d 1318 (1987). Thus, the
standard of living should be considered in determining spousal
support. *Id.*

Likewise, with regard to child support, a court should not
countenance a supporting parent's extravagant lifestyle while
he leaves his children with less than reasonable support.

> [P]arents do have an obligation to share with their children
> the benefit of their financial achievement. *See Conway [v.
> Dana,* 456 Pa. 536, 538, 318 A.2d 324, 325 (1974) ] ("station
> in life of the parties" is relevant in determining parents'
> capacity to support their children). Thus, where the par- .
> ents' incomes permit, it may be perfectly proper for a court
> to recognize that certain expenditures for recreation, enter-
> tainment, and other nonessential items are reasonable and
> in the best interest of the children. *See Spingola v. Spingo-
> la,* 91 N.M. 737, 580 P.2d 958, 964 (1978) ("Where the
> income, surrounding financial circumstances and station in
> life of the father demonstrates an ability on his part to
> furnish additional advantages to his children above their
> actual needs, the trial court should provide such advantages
> within reason.").

*Melzer v. Witsberger,* 505 Pa. 462, 470–71, 480 A.2d 991, 995
(1984). *See also Francis v. Francis,* 358 Pa.Super. 391, 395–
96, 517 A.2d 997, 999 (1986), quoting *Commonwealth ex rel.
Stump v. Church,* 333 Pa.Super. 166, 172, 481 A.2d 1358, 1361
(1984) ("Reasonable expenses are not limited to the bare
necessities of life, but extend to articles that are reasonably
necessary for the proper and suitable maintenance of the child
in view of his social station in life ... and the fortune
possessed by him and his parents...."). Justice Musmanno
has more colorfully observed:

> In arriving at the amount a mother and children need in
> order to live properly, the Court below seemed to be of the
> belief that so long as they were assured a roof over their
> heads, sufficient raiment and adequate food on the table, the
> husband-father had met his obligations of support. This

reasoning is an erroneous one. If the husband-father can afford for himself a caviar-champagne standard of living, it is not justice, nor legal, that the wife should be content with a tent and bread-and-butter menu for herself and brood. Dignity of living, commensurate with income, is as much a necessity as the bare essentials for survival.

*Commonwealth ex rel. Gitman v. Gitman,* 428 Pa. 387, 394, 237 A.2d 181, 185 (1967) (plurality).

Review of the trial court opinion reveals that the trial court did not consider Wife's previous standard of living for purposes of computing alimony. This was error. 23 Pa.C.S.A. § 3701(b)(8). While the trial court correctly based the award on Wife's need to stay home and raise her younger children, the court merely equated the alimony with Wife's assigned earning capacity.

Moreover, the court's limited discussion and highlight of the children's standard of living, in my view, is inadequate. The court criticizes Wife for giving too much attention to her children. The court even suggests that Wife wastes money by picking up her daughter with a taxi, due to Wife's inability to drive at night. The court would require a sixteen year old girl to obtain a driver's license so she could drive at night. In the court's view, the Wife would then be able to save on taxi cab expenses. However, the court failed to consider that the addition of a teenaged driver to an automobile insurance policy which covers a Mercedes and Volvo would be costly, if not prohibitively expensive.

Before Husband and Wife separated, their children were able to buy clothes whenever they wanted to do so. After separation, the oldest daughter, Jennifer, testified that her mother could not afford to buy her clothes for Jennifer's first year at college. N.T. August 17, 1990 at 37. The family previously had an available income of $30,000.00 *per month.* N.T. June 6, 1990 at 6–7. The court's order of alimony and child support leave available for Wife and the children approximately one-fifth of that amount.

Meanwhile, Husband was determined to have an earning capacity of $165,000.00 per year. As I have opined above, a more thorough investigation into Husband's completed asbestos files would result in a more accurate, higher earning capacity. In addition, Husband's law firm pays his paramour $40,800.00 per year plus benefits and her daughter $17,000.00 per year. *See* N.T. August 14, 1990 at 180–81. Husband determines these salaries. Husband's paramour also earns $50.00 per hour for consulting work that she does for the firm's clients. N.T. August 21, 1990 at 120. Although Husband makes these outlays through his law firm, his paramour pays *ninety to ninety-five percent of* his living expenses. *Id.* at 136–37.

Contrary to the trial court's conclusion, I would conclude that Husband's earning capacity never fell below $325,000.00, his previous income as a partner at Blank, Rome, Comisky & McCauley. To the trial court's attribution of $165,000.00, I would add his paramour's salary of $40,800.00 and her daughter's salary of $17,000.00, because Husband realized economic benefit by circling funds through them. If a more accurate picture of the completed asbestos files were allowed, I believe the court would have realized that Husband's store of one thousand unsettled cases could result in Husband earning *at least* an extra $100,000.00 per year above what was already considered. These factors lead me to conclude that Husband's earning capacity remained $325,000.00 despite his efforts to the contrary.[3] There is room in Husband's earning capacity to effectuate for Wife and the children at least a semblance of their prior standard of living.

I would hold that the trial court erred in awarding Wife only $30,000.00 per year and the children only $701.00 per week in support for three children and $640.00 per week in support for two children since the eldest had started college. I also believe that Wife's spousal support award of $565.00 per week

3. While the majority accepts the trial court's statement that Husband did not intentionally reduce his income, I conclude from the record that the more relevant factor, Husband's capacity, *see* 23 Pa.C.S.A. § 3701(b)(1), never decreased.

was erroneous. While the awards of alimony and support may appear to some as high, they drastically diminish the standard of living of the family which Husband left while not diminishing his.

### Pennsylvania Uniform Gift to Minors Act Accounts

Wife argues that the court of common pleas had no jurisdiction to decide whether she should replenish the funds in her children's accounts which were established pursuant to the Pennsylvania Uniform Gift to Minors Act [PUGMA]. Wife further asserts that the trial court erred in requiring her to pay back funds which she had withdrawn from those accounts. Wife asks this Court to reverse that holding and remand to the Orphans' Court for determination. I agree that the trial court erred, but I disagree that a remand is necessary.

I agree with the majority's analysis that the trial court had jurisdiction to decide the merits of Wife's contentions regarding the PUGMA accounts. Moreover, the majority correctly held that the standard to be used in determining whether a custodian wrongfully depleted PUGMA assets is lower than the standard which the trial court employed.

PUMGA specifically sets forth the relevant standard:

(b) The custodian shall pay over to the minor for expenditure by him or expend for the minor's benefit so much of or all the custodial property as the custodian deems advisable for the support, maintenance, education and benefit of the minor, in the manner, at the time or times, and to the extent that the custodian, in his discretion, deems suitable and proper, with or without court order, with or without regard to the duty of himself or of any other person to support the minor, or his ability to do so, and with or without regard to any other income or property of the minor, which may be applicable or available for any such purpose.

20 Pa.C.S.A. § 5305(b). Pursuant to this standard, the custodian is given broad discretion in expending the minor's funds for the benefit of the minor. *See Sutliff v. Sutliff,* 515 Pa. 393, 404, 528 A.2d 1318, 1323 (1987) (plurality), citing 20 Pa.C.S.A.

§ 5305(b) (custodian has duty to use property for child's benefit). Therefore, the trial court's use of an inconsistent standard, *i.e.*, whether the expenditures were for "non-necessities," Conclusion of Law No. 13, or for "non-essential items," Trial Court Opinion at 23, was erroneous.

While both the majority and I agree on the proper standard, we disagree as to the appropriate remedy. The majority remands for a redetermination according to the proper standard. In my view, a remand is not necessary in this case.[4] This is a legal question, and I would draw the legal conclusions based upon the facts of record which the parties have already developed on the issue of the propriety of Wife's use of PUGMA funds.

I would conclude, based upon the record, that Wife need not replenish the PUGMA accounts. Wife described how her use of the funds benefited her children. Moreover, she was compelled to resort to those accounts because Husband refused to fund any summer activities for his children's recreation. Husband has not directed our attention to any evidence of record to refute Wife's testimony.[5] Therefore, the only remaining issue, whether the expenditures were for the benefit of her children, is a legal one.

Giving deference to Wife, the custodian, *see* 20 Pa.C.S.A. § 5305(b), I would find that Wife did not abuse her statutory discretion. She testified how each of the expenditures helped in the education or benefit of her minor children. *See* 20 Pa.C.S.A. § 5305(b).

During their marriage, the parties established gift accounts for their children. The funds would become available when the children turned eighteen years old. N.T. February 25, 1991 at 365. Wife spent $6,000.00 of the PUGMA account on

4. Indeed, a remand will only perpetuate this involved litigation and again place Wife at a disadvantage of having to spend twice as much money on counsel than Husband does.

5. In his appellate brief, Husband asserts that Wife used at least $52,-500.00 in PUGMA funds to pay her divorce attorney's retainer. *See* Husband's Brief at 26. However, Husband fails to cite to any evidence in support of that contention.

tennis and piano lessons and math and chemistry tutoring for her children. *Id.* at 396–98. The children had incurred $1,000.00 in tax liability, and that was satisfied with PUGMA funds. *Id.* at 398. Wife had insufficient funds to personally pay for the opening of the swimming pool, so she borrowed from her children to open it for their summer enjoyment. *Id.* at 399.

Wife took her children to Washington D.C. three times to avoid the depression they were all suffering from the breakup of their family. She borrowed from them $4,500.00 for transportation, hotels and meals for the three trips. *Id.*

> And also a portion of the carrying of the [New Jersey Shore] condominium. For the last two, three summers the children were home with nothing to do because [Husband] refused to pay for any programs for them. The only place where they're actually happy is the shore....

*Id.* at 399–400. Therefore, she used $30,000.00 of the PUGMA funds to pay for the mortgage, condominium fees, maintenance and utilities for approximately two years. Wife also disbursed from those accounts the costs of transportation to and from the shore, dining, amusements, concerts, and shows, which totalled $6,000.00. *See id.* at 401–02. Wife also used $5,000.00 to pay for legal fees in an attempt to create for her children a more stable visitation schedule from their father. *Id.* at 402.[6]

Wife was forced to spend the children's money on more of their expenses, *id.* at 403–04, including the children's visits to a psychiatrist occasioned by the breakup of the family. *Id.* at 404. Contrary to Wife's expectations,[7] Husband did not reimburse the children for these costs. *Id.* Wife also had to attend psychological therapy just to maintain her balance as a

---

**6.** With assistance of counsel, Wife entered into an agreement with Husband whereby he would accept visitation with the parties' children, every other weekend, for a period of three months. *See* Agreed Temporary Order Without Prejudice, March 8, 1989 at 1, para. 2.

**7.** *See* Agreed Temporary Order Without Prejudice, March 8, 1989 at 2, para. 6 ("Father agrees to be solely responsible for the psychiatric expenses of the children with Dr. Schecter during this [temporary three month] period as are reasonably appropriate.").

good mother. "It was my duty to these children and to God to get some therapy and to be able to deal with them; that they have a full parent and not a depressed mother." *Id.* at 405. Finally, some of the money went to medical care. *Id.* at 406–08.

The foregoing testimony establishes that Wife spent the children's money for their education and benefit. While the funds were spent on more than bare necessities, Wife's use of those funds enabled her children to approximate the lifestyle to which they had become accustomed. When Wife was left with bored, depressed children and had little money to entertain them, she was entitled, as custodian, to allocate the children's money for their happiness and well-being. I would not bind the custodian in this situation from reaching PUGMA funds. By divesting discretion in custodians, the General Assembly did not intimate such unreasonable restraint.

My analysis does not change due to Wife's statements that she intended to repay the money derived from the PUMGA accounts. *See* Order, July 28, 1988 (noting Wife's stated intention to return funds from "children's trusts"); N.T. February 25, 1991 at 396. The determinative question before us is whether Wife *must* return the funds. She need not.

### Counsel Fees

Wife maintains that the court should have granted her attorney's fees. I agree.

> The purpose of an award of counsel fees is to ensure that the financially dependent spouse will be able to maintain or defend against an action for divorce, as well as to effectuate economic justice. *Schubert v. Schubert,* 398 Pa.Super. 284, 580 A.2d 1351 (1990). Counsel fees in a divorce proceeding are not awarded automatically; the petitioning spouse must show actual need before such an award is justified. *Kohl v. Kohl,* 387 Pa.Super. 367, 564 A.2d 222 (1989).... The amount of an award for counsel fees, costs, and expenses awarded in a divorce action is within the discretion of the trial court and is subject to an abuse of discretion standard

on appeal. *Williamson v. Williamson,* 402 Pa.Super. 276, 586 A.2d 967 (1991).

*Butler v. Butler,* 423 Pa.Super. 530, 621 A.2d 659 (1993).

The "character, situation and surroundings of both parties must be considered." *Benson v. Benson,* 357 Pa.Super. 166, 172, 515 A.2d 917, 920 (1986). A party seeking counsel fees is not necessarily entitled to full reimbursement of legal costs. *See Williamson v. Williamson,* 402 Pa.Super. 276, 290, 586 A.2d 967, 974 (1991), citing *Brong v. Brong,* 129 Pa.Super. 224, 195 A. 439 (1937). "Rather, the amount awarded should be sufficient so as to advance just results and to place the litigants on equal footing." *Williamson v. Williamson, supra.* *See also* Wilder, Mahood and Greenblatt, Pennsylvania Family Law Practice and Procedure Handbook § 11–4 at 112 (2nd ed. 1989) (citations omitted) (the counsel fee award should be "sufficient to place the parties 'on par' in asserting their rights in the litigation and to prevent the denial of justice"). Therefore, to determine what "equal footing" means, the court must consider both parties' financial ability to retain competent legal representation. Counsel fees are especially appropriate for those expenses necessitated by the party in the more advantageous financial position. *See Endy v. Endy,* 412 Pa.Super. 398, 407–08, 603 A.2d 641, 646 (1992) (where husband was responsible for prolonging litigation, wife was properly awarded counsel fees).

In the instant case, Wife's present attorneys have billed $283,000.00 in legal fees and almost $45,000.00 in costs.[8] The record indicates that she was able to pay approximately $175,000.00 of this amount.

Husband also retained a law firm which has billed a large sum of money. Before this appeal, Husband had incurred $150,000.00 in legal fees. In addition to having representation by hired counsel at all of the relevant court proceedings, Husband himself is an experienced divorce lawyer in the Montgomery County legal community. More importantly,

---

**8.** The trial court states that Wife may still owe over $28,000.00 to previous counsel.

Husband entered his appearance as co-counsel. Hence, from November 9, 1989, when Husband entered as co-counsel, throughout the litigation, Husband had the benefit of two attorneys. He paid for the services of one. I add that Husband is the attorney of record in this appeal.

I believe the trial court should have considered Husband's free representation of himself. First, it indicates that the presence of two counsellors for a litigant was not unreasonable. As Husband had two attorneys, Wife should not have been penalized because her firm often sent two, and occasionally three, attorneys to hearings. Secondly, the court should have considered that Husband suffered no out-of-pocket cost for his own representation, while Wife is being charged for the services of every attorney who has worked on her case. Therefore, Husband's attorneys' fees of $150,000.00 do not reflect any less of a representation than Wife had; he only paid less for it.

Moreover, some of Wife's attorney's fees and costs can be attributed to issues which Husband insisted on litigating. For example, he pressed the contention that Wife was not entitled to support payments. Wife's legal counsel thoroughly defended and eventually won this issue. The trial court should have considered that much of Wife's attorney's fees were reasonably related to issues which she had to defend or risk prejudicing her legal rights. Husband should not be punished for raising issues in a divorce proceeding, but nor should Wife. While the court emphasized that Wife's attorney's fees were sometimes excessive,[9] it never compared those fees to the

9. As the majority notes, "the court may consider 'discrepancies in counsel's statement of account.'" Majority Opinion at 285, quoting Gioia v. Gioia, 382 Pa.Super. 538, 550, 555 A.2d 1330, 1337 (1989). While this is true, the trial court in this case reported no "discrepancies." The trial court merely chose isolated incidents where two or three attorneys worked on Wife's case on the same day. The trial court was not satisfied with the accounting of legal fees because "[c]onferences or telephone calls in many cases did not indicate either the subject or the person called, research does not show what was being researched, preparation of memoranda of law does not show the subject matter of the memorandum of law." Trial Court Opinion at 21.

value of Husband's total representation. Further, the court did not sufficiently address the reasonableness or necessity of *all* of Wife's attorney's fees.

When these factors are considered, Wife is entitled to an award of attorney's fees. Although I would not disturb the trial court's finding of fact that Wife was able to afford the legal fees which were already paid, I would hold that the court erred in not considering Husband's capacity to aggressively represent his own interests and Wife's need to spend much of the fees which she did in defending her interests and those of their children. I would hold that the court erred in not awarding Wife the amount of counsel fees which had been billed less that which she has already paid.

For the above reasons, I dissent.

My review of the exhibits on Wife's attorneys' fees and litigation costs indicates that many of the charges do indicate who was called and are otherwise reasonably specific. *See generally* N.T. March 5, 1991 at 171 and exhibits entered into evidence. I would not require counsel to spend more billable hours in order to render more specific statements of expenses.