# Carney v. Carney

2

*Jane Roach Maughan*, for plaintiff.
*Donald F. Spry, II*, for defendant.

HIGGINS, *J.*, February 15, 2013—These are exceptions filed by Donald R. Carney (hereinafter "husband") from the recommendations of Robert C. Lear, Esquire, Divorce Master (hereinafter "master"). The Carneys were married

on April 3, 1987. No children were born of the marriage. Kathy M. Carney (hereafter "wife") filed a complaint for divorce on July 30, 2010. The parties attended three hearings before the master on June 22, 2011, October 26, 2011, and November 22, 2011. Concurrently, an APL de novo hearing was held before the support master on January 28, 2011 and an expert trial deposition was taking on July 12, 2011. Since alimony is an issue in this case, it was agreed that the testimony before the support master would be incorporated in this proceeding. The master filed his report and recommendations on June 20, 2012. The master's report recommended equitable distribution of the assets. Husband filed timely exceptions to the report on July 10, 2012. Husband submitted his brief in support of defendant's exceptions to the master's report on August 17, 2012. Wife filed her brief in opposition to defendant's exceptions on the same day that argument was held before this court on October 1, 2012. Husband filed his reply brief to wife's brief on October 11, 2012.

## DISCUSSION

When evaluating the merit of any exceptions filed to a divorce master's recommendation, this court must first examine the master's report. In Pennsylvania, "a master's report and recommendation, although only advisory, is to be given the fullest consideration, particularly to the question of credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties." *Moran v. Moran*, 839 A.2d. 1091, 1095 (Pa. Super. 2003) (*citing Simeone v. Simeone*, 551 A.2d 219, 225 (Pa. Super. 1988)). However, the master's report "is advisory only...and the reviewing court is not bound by it and it does not come to the Court with any preponderate weight or authority which must be overcome." *Rothrock v. Rothrock*, 765 A.2d 400, 404 (Pa. Super. 2000) (*citing Arcure v. Arcure*, 281 A.2d 694, 695

4

(Pa. Super. 1971)). In determining issues of credibility, the master's findings must be given the greatest weight because "it is he who heard and observed the witnesses." *Mott v. Mott*, 453 A.2d 1038 (Pa. Super. 1982). "[A]lthough the master's report is entitled to great weight, it is the responsibility of the court to make the final equitable distribution." *Trembach v. Trembach*, 615 A.2d 33, 35 (Pa. Super. 1992) (*citing Morschhauser v. Morschhauser*, 516 A.2d 10 (Pa. Super. 1986)).

Husband filed eighteen exceptions to the report of the master, contending that the master erred (1) in valuing Brother's Auto Transport at either $963,922 or $849,888 based on alternate tax effected values which were based on a calculated value, not a fair market value; (2) by rejecting the fair market value of Brothers Auto Transport (before tax effecting) at $1,000,000 based upon a valuation report; (3) in rejecting the tax effected value of a net loss of $497,464 dollars for Brothers Auto Transport which was based upon a valuation report which established a fair market value; (4) to the extent that it was determined that the ESSA joint checking account was utilized for a large number of husband's bills; (5) to the extent that it was determined that wife was totally disabled (master's report, p. 9); (6) in failing to account for husband's contribution to acquisition of assets (equitable distribution factor 7); (7) in considering an agreement of sale to purchase a property as evidence of stand of living of the parties during the marriage (equitable distribution factor 9); (8) in considering that wife is the primary caretaker for her eighty-five (85) year old mother and sixty-two (62) year old mentally challenged disabled brother as a factor in the standard of living of the parties (equitable distribution factor 9); (9) in recommending a transfer of the formal marital home to wife and recommending husband satisfy the mortgage or obtain a release of wife from the mortgage;

(10) in recommending that husband pay the taxed on the Ameriprise 401(k) which was awarded to wife; (11) in recommending that Husband contribute towards wife's counsel fees; (12) in recommending a skewed distribution scheme which transfers assets to Husband at improper values and requires him to assume all martial debt; (13) to the extent that there was a finding that wife is totally disabled (alimony factor 2, master's report, p. 15); (14) in finding as an alimony factor that wife's earning power, expenses or financial obligations are affected by her care for her eighty-five (85) year old mother and her sixty-two (62) year old mentally challenged disabled brother (alimony factor 7, master's report, p. 16); (15) in finding as an alimony factor that husband's standard of living during marriage is affected by an agreement of sale to purchase a residence (alimony factor 8, master's report, p. 16); (16) in recommending that husband pay permanent alimony; (17) in recommending that Husband pay $8,000 per month in permanent alimony; and (18) in recommending that husband procure life insurance in the amount of $500,000. We will now address each exception.

## I. MASTER'S ACCEPTANCE OF PLAINTIFF'S VALUE OF BROTHER'S AUTO TRANSPORT BASED UPON A CALCULATED VALUE, AS OPPOSED TO A MARKET VALUE. (Exceptions 1-3).

We will now dispose of exceptions 1-3. Husband is the one-hundred percent (100%) owner of a business known as Brother's Auto Transport. (Master's report, page 5). Brother's Auto Transport picks up new and used vehicles and transports them to various locations across the country. (Master's report, P. 5). Brother Auto Transport owns approximately forty (40) auto carrier tractors and trailers, most of them highly specialized for the transport business and has had average gross sales of nearly $9,000,000 annually over the past four (4) years. (Master's report, p.

5). The parties differ as to the valuation of the business and presented evidence in support of each side. (Master's report, p. 6).

Husband contends the master erred by adopting the wife's valuation evaluation, specifically, (1) in valuing Brother's Auto Transport at either $963,922 or $849,888 based on alternate tax effected values which were based on a calculated value, not a fair market value; (2) by rejecting the fair market value of Brothers Auto Transport (before tax effecting) at $1,000,000 based upon a valuation report; and (3) in rejecting the tax effected value of a net loss of $497,464 for Brothers Auto Transport which was based upon a valuation report which established a fair market value.

In determining the value of marital property, the court is free to accept all, part or none of the evidence as to the true and correct value of the property. *Smith v. Smith*, 2006 PA Super 175, 904 A.2d 15, 22 (Pa. Super. 2006) (citing *Litmans v. Litmans*, 449 Pa.Super. 209, 673 A.2d 382, 395 (Pa. Super.1996) *Aletto v. Aletto*, 371 Pa. Super. 230, 537 A.2d 1383 (Pa. Super.1988)). Furthermore, the Pennsylvania Divorce Code fails to specify the standard of value that should be applied in the context of equitable distribution. *Buckl v. Buckl*, 542 A.2d 65, 70 (Pa. Super. 1988). The method of valuation depends on the nature of the property interest involved, and the court must look at "the realities of the situation and avoid an unrealistic valuation." *Buckl*, 542 A.2d at 70. Thus, this court is not bound to apply a specific valuation method when making a determination for equitable distribution. *Id.*

In his brief, husband cites persuasive authority consisting of IRS Regulations, Revenue Rulings and non-binding case law in support of his argument that the Master should have adopted his valuation evaluation

which is based on the fair market value standard of business evaluation, as opposed to wife's evaluation method which is based on the calculated value of the business. [Husband's brief in support, p. 8-11] We will now review the valuation methods used by both parties' experts.

Husband employed the services of Jake Grow, who is in the business of selling new and used automobile transport equipment, to determine the value of the trucks as assets for Brother's Auto Transport. [N.T. 6/22/2011, p. 9]. Mr. Grow has done business with husband for years and has sold a significant portion of the current assets being valued to husband. [N.T. 6/22/2011, p. 10-11 and N.T. 10/26/2011, p. 71]. Mr. Grow also considers himself to be personal friends with husband. [N.T. 6/22/2011, p. 11] When determining value for the trucks, Mr. Grow testified that he doesn't use the NADA guidelines or any other outside material, but bases the value solely on his experience. [N.T. 10/26/2011, p. 64 and N.T. 6/22/2011, p. 32]. The value number generated by Mr. Grow for the value of the trucks was $974,100. [N.T. 10/26/11, exhibit D-9]. This number was then utilized by Dale N. Capone, CPA, CVA (hereinafter "Capone"), husband's expert witness, to determine the value of Brother's Auto Transport. Capone valued the business using an income approach to determine the fair market value at $1,000,000 as of December 31, 2010. [N.T. dated 10/26/11, pp. 8, 9, and D-9]. Capone opined that if the business were sold there would be a net loss of $497,464 due to the debt and tax effected value. [Master's report, p. 6].

Wife employed the services of Barry E. Ridger, the owner of East Coast Truck and Trailer Sales, which has been involved with auto carriers since the 1990's, to determine the valuation of the trucks. [N.T. 10/26/2011, p. 12]. Mr. Ridger analyzed each individual unit in the Brother's Auto Transport Fleet, obtained the NADA

value for it, and then used the NADA value for the trucks combined with the value of the trailers from his own sales expertise to achieve final values. [N.T. 10/26/2011, p. 55-56]. Based on his calculations, he valued the trucks and trailers at the sum of $3,336,134, and then added the value of 2001 Ford Expedition valued at $6,000 and 2002 Ford F-150 also valued at $6,000. [Plaintiff's exhibit- 90]. Those values were then utilized by David E. Coffman, CPA, ABV, CFF, CVA (hereinafter "Coffman"), who then determined the revised calculated value of the company was $1,978,328. [N.T. 6/22/11, 21, plaintiff's exhibit 94]. If the business were sold, Coffman established that the net, after payment of taxes would either be $963,922 or $849,888 if a carryover of net operating loss (NOL) from 2010 was not applied. [Master's report, P. 6].

The master noted that vast difference in the valuations of the business comes from the value associated with the trucks and their specialized trailers in that these are all the assets of the business. [Master's report, pp. 6-7].

The master made a factual finding that Mr. Ridger was very credible. (Master's report, page 7). The master reasoned that Mr. Ridger was impressive not only because of his expertise in the field but also in the methodical way that he analyzed every single piece of equipment that was owned by the business using the then current NADA values for the tractors, then his own expertise for the highly specialized trailers that are not given a NADA value due to their unique status. (Master's report, p. 7). Based on this factual finding and also on the work of David E. Coffman, the master found wife's expert witness who used the valuation numbers from Mr. Ridger to determine the value of the business to be most reliable and adopted wife's valuation evaluation for purposes of the balance of the master's report. (Master's report, p. 7).

As this is an issue of credibility, we give the greatest weight to the master's factual findings. After reviewing the record, we agree with the master that the record is clear regarding Mr. Ridger's analysis and valuation of Brother's Auto Transits assets. [*See* N.T. 10/26/2011, pp. 12-60 and plaintiff's exhibit 90]. Therefore, we agree with the master's finding that Wife's valuation evaluation of Brother's Auto Transport is the most reliable and used for the purposes of the balance of this report. Defendant's exceptions numbered one (1), two (2), and three (3) are therefore denied.

## II. MASTER'S FINDING THAT THE ESSA JOINT CHECKING ACCOUNT WAS UTILIZED FOR A LARGE NUMBER OF HUSBAND'S BILLS. (Exception 4).

We will now address husband's divorce exception number four (4). Husband contends that the master erred in determining that the ESSA joint checking account was used for a large number of husband's bills. The ESSA joint checking account had a balance of $58,000 at the time of separation. (Master's report, page 7). The master made a factual finding that post separation, wife used the ESSA joint check account for payment of husband's bills and household expenses and even went as far as to inform husband that she was writing these checks and he did not protest nor take any withdrawals from the account. (Master's report, page 7). The account was closed after the last bill. (Master's report, page 7).

Husband contends the master found that husband did not make withdrawals from the account other than the alleged bills that were apportioned to him. (Master's report, page 7). However, husband argues that the master did not elaborate or determine the validity of the bills, nor did he account for the specific amount attributed to

husband and that the record is denied of any account or evidence of whose bills were paid. (Husband's brief in support of exceptions, page 11). In opposition, wife argues that husband did not contradict her testimony or introduce evidence that the account was used solely for wife's personal needs. (Wife's brief in opposition, page 11). In husband's reply brief, husband argues that wife almost exclusively used the joint ESSA checking account. (Husband's reply brief, p. 4).

A review of the record reveals wife testified that she used this account post separation for payment of husband's bills for prescriptions and medical bills as well as household expenses. (Hearing transcript 10/26/11, pp. 100-101). Wife even went as far as to inform husband she was writing these checks and that he did not object. (Hearing transcript 10/26/11, p. 101). Husband did not present any evidence or conflicting testimony as to wife's testimony. As this is an issue of credibility, we give the greatest weight to the master's factual findings. After reviewing the record, we agree with the master that the record is clear regarding the wife's use of ESSA checking account to pay husband's bills. We will not disturb the master's determination on this subject. Thus, defendant's exception no. 4 is denied.

### III. MASTER'S FINDING THAT FACTOR 7 — "The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as a homemaker" CLEARLY FAVORS THE WIFE. (Exception 6).

We will now address husband's exception number six (6). Husband asserts that the master incorrectly favored Wife when evaluating factor number seven (7) concerned with the dissipation or contribution of each party in the

acquisition, preservation, depreciation or appreciation of the martial property. The master determined that factor seven (7) "clearly favors Wife due to her contribution as a homemaker in maintaining of the interior and exterior of the residence while Husband was working long hours to increase the size and profitability of the business." (Master's report, p. 10).

Husband concedes that he was unable to contribute as a traditional homemaker due to working long hours to increase the size of the business and personal wealth of the parties. (Husband's brief in support, p. 11). However, husband argues he installed an in ground pool, pool house, new garage, barn, a putting green, and professional landscaping to add to the overall value and enjoyment of the martial home where the wife remained after separation. (Husband's brief in support, pp. 11-12).

Wife's role during the marriage was that of housekeeper and homemaker. [N.T. 10/26/11, p. 102]. In that capacity, she took care of the cooking, cleaning, dry cleaning, grocery shopping, and yard work to the exterior of the home. [N.T. 10/26/11, pp. 102-103]. Furthermore, when husband's children from his previous marriage were scheduled to visit, wife would drive over 500 miles round trip to and from Attica, New York, usually early in the morning, so the children would be there when he came home for dinner. [N.T. 10/26/11, p. 103].

Wife testified that the improvements to the martial home, highlighted above, were made a couple of years ago. [N.T. 10/26/11, p. 84]. Wife further testified that the martial home had been previously paid off in full and that the funds to pay for those items were borrowed on the current mortgage. [N.T. 10/26/11, p. 84]. That mortgage remains against the martial home and the current balance as of the date of this hearing was $159,000. [N.T. 10/26/11,

p. 85]. The master took into consideration that Husband did work long hours to increase the size and profitability of the business. [Master's report, p. 10]. Husband was awarded one-hundred percent (100%) of the interests in the business and the business real estate, which represents husband's valuable contribution to the creation of the business. [Master's report, p. 5]. We will not disturb the master's determination on this subject. Thus, defendant's exception number six (6) is denied.

IV. MASTER'S ERRED IN RECOMMENDING A SKEWED DISTRUBTION SCEME WHICH TRANSFERS ASSETS TO HUSBAND AT IMPROPER VALUES AND REQUIRES HIM TO ASSUME ALL MARTIAL DEBT, SPECIFICALLY, MASTER'S RECOMMENDATION THAT HUSBAND TRANSFER THE FORMER MARITAL HOME TO WIFE AND THAT HUSBAND SATISFY THE MORTGAGE OR OBTAIN A RELEASE OF WIFE FROM THE MORTGAGE AND MASTER'S RECOMMENDATION THAT HUSBAND PAY THE TAXES ON THE AMERIPRISE 401(K) WHICH WAS AWARDED TO WIFE. (Exceptions 9, 10, and 12).

Husband contends that the divorce master erred in recommending a transfer of the formal marital home to wife and recommending husband satisfy the mortgage or obtain a release of wife from the mortgage and in recommending that husband pay the taxes on the Ameriprise 401(k) which was awarded to wife. (Husband's brief in support, pp. 12-13). As a result, husband argues that the master's recommendations resulted in a skewed distribution scheme which transfers assets to husband at improper values and requires him to assume all martial debt.

Husband argues that the master improperly awarded

the marital home to wife and recommended that husband either satisfy the mortgage or release wife from its terms. (Husband's brief in support, p. 13). He asserts that the record lacked any analysis of whether husband has the financial ability to satisfy the mortgage or obtain a release. (Husband's brief in support, p. 13).

In regards to the Ameriprise 401(K) account, husband concedes that the master properly considered the tax consequences of the Ameriprise account and argues that the master erred in requiring husband to pay the taxes to wife. (Husband's brief in support, p. 13). We will now review the equitable distribution scheme.

Husband's exceptions are based on the premise that the value of Brother's Auto Transport is contrary to law. (Husband's brief in support, pp. 12-13). We have already determined that the master's adoption of wife's valuation evaluation of the business at $3,336,134.00 was not contrary to law and will review the master's recommendation for equitable distribution.

The master determined that Brother's Auto Transport is a successful business and would be worth significantly less to the parties if it were liquidated and its assets sold. [Master's report, p. 12]. Instead of forcing the parties to liquidate the business, the master awarded all of the business interests and property to husband which is worth approximately $3,336,134. [Master's report, p. 5]. To make up for this disparity, the master recommended that wife be awarded the martial home worth $244,400 and directed husband to either satisfy the existing debt of approximately $150,000 or assume it solely, as well as directed that husband be held responsible for the taxes the Ameriprise 401(K) account worth $231,662, which equates to approximately $62,800 owed in taxes, with the disparity of the award made by "substantial" or

14

"permanent" alimony award. [Master's report, pp. 12-13].

We find that the husband's allegations that the equitable distribution scheme is skewed because the master's award results with the husband saddled with all the debt of approximately $621,470, while wife receives assets of $534,062 to be unfounded. Husband was given 100% of the business. There remains a significant disparity between the value of the assets awarded to the husband versus the value of the martial assets awarded to the wife, even after the martial debt accumulated by husband is subtracted from that amount. The master sought to reimburse the wife of the remaining significant disparity in the value for the amount of assets by awarding her substantial or permanent alimony. Therefore, we will not disturb the master's findings in regard to equitable distribution and husband's exceptions number nine (9), ten (10), and twelve (12) are denied.

## V. MASTER CONSIDERED HUSBAND'S AGREEMENT OF SALE TO PURCHASE A PROPERTY AS EVIDENCE OF STANDARD OF LIVING OF THE PARTIES DURING THE MARRIAGE AND THAT HUSBAND'S STANDARD OF LIVING IS AFFECTED BY THE PURCHASE.
(Exceptions 7, 15).

Husband argues that the master inappropriately considered evidence regarding an agreement of sale to purchase a residence as an indication of the standard of living during the marriage. Pennsylvania Divorce Code states that "[t]he standard of living of the parties established during the marriage" are a factor to be considered in equitable distribution – 23 Pa.C.S. § 3502(a) (9) and alimony – 23 Pa.C.S. § 3701(b)(8). In *Edelstein v. Edelstein*, the Superior Court held that fact that parties had

lived economically during marriage while accumulating wealth did not provide basis for depressing wife's standard of living following separation. *Edelstein v. Edelstein*, 582 A.2d 1074 (Pa. Super. 1990) The Superior Court reasoned that

> While the restricted lifestyle might have been tolerable, it was below that which was reasonably possible with appellant's income and position, not out of necessity, but as a matter of choice. The cases which support the position that the standard of living after separation, if possible, should reflect the conditions existing before separation, turn on the available income and lifestyle that income would support. To live during the marriage in a fashion dedicated to reducing expenditures and accumulating wealth, thereby living far below the standard one would expect of persons in that position, cannot be a basis for depressing the living standard of the wife, while permitting the husband to continue to amass large financial assets after separation.

*Edelstein v. Edelstein*, 582 A.2d 1074, 1077 (Pa. Super. 1990). Thus, the court may consider available income and lifestyle that income may support before the marriage.

Furthermore, "Alimony" is based upon reasonable needs in accordance with the lifestyle and standard of living established by the parties during the marriage, as well as *the payor's ability to pay. Teodorski v. Teodorski*, 857 A.2d 194 (Pa. Super. 2004) (*emphasis added*).

The divorce master found that the lifestyle of the parties was "more than adequate" relying evidence of the renovations and improvements to the premises in 2006. [Master's report, p. 11.] Those improvements to the martial home consisted of a 40 by 40 foot garage, pole barn, a putting green, a 40 x 18 foot in ground swimming pool, a pool house, a gazebo, two waterfalls, a pond and a little

stream that goes into the pond, a lot of pavers, a fancy grill outside, landscaping, and fencing for the premise. [N.T. 10/26/2010, p. 84.]

Husband testified that business has been bad since 2008 and is ongoing to the present day. [N.T. 07/12/2011, pp. 8-13]. Husband claims, "There is no income from the business. Very little income from the business. There's enough cash flow to continue to pay the bills." [N.T. 07/12/2011, p. 13.] However, husband testified that in 2010 he took $342,808 out of the business for his own personal matters. [N.T. 07/12/2011, p. 21]. Husband had personal expenditures in the amount of $11,640 paid for the business and $13,590 in professional fees paid by the business in 2010. Then in 2011, during the five month period when this information was gathered, husband averaged approximately $18,922.63 per month. It appears that husband's income in 2011 will be comparable to his income in 2010. [N.T. 7/12/2011, p. 57.]

In spite of husband's assertions that business is bad and that he is essentially unable to maintain the lifestyle and standard of living that he had during the marriage due to the business being in decline, he continued to make substantial payments to himself for his own personal matters and also entered into an agreement of sale for the purchase of a $400,000 property in Hamilton Township comprised of 4,825 square foot house with an indoor swimming pool on 5.39 acres. [N.T. 11/22/2011, exhibit "Standard Agreement of Sale", and master's report, p.11.] The master found that husband was maintaining his lifestyle and standard of living that he enjoyed during his marriage as evidenced by the extensive payments husband made to himself from the business and the fact that husband entering into an agreement of sale for the purchase of property worth $400,000. As this is an issue of credibility, we rely extensively on the master's findings.

After a review of the record, we agree with the master's finding and will not disturb the master's recommendation in regards to standard of living factors for equitable distribution or alimony. Therefore, husband's exceptions number seven (7) and fifteen (15) are denied.

## VI. MASTER'S RECOMMENDATION THAT HUSBAND CONTRIBUTE TOWARDS WIFE'S COUNSEL FEES. (Exception 11).

We will now address husband's exception number eleven (11) to the divorce master's report and recommendation. The master determined that husband is to contribute $15,000 for wife's reasonable counsel fees pursuant to 23 Pa.C.S. § 3702. Husband contends that there is insufficient evidence to support a basis for counsel fees. [Husband's brief, p. 13.]

Counsel fees are awarded based on the facts of each case after a review of all the relevant factors. These factors include the payor's ability to pay, the requesting party's financial resources, the value of the services rendered, and the property received in equitable distribution. *Busse v. Busse*, 921 A.2d 1248, 1258 (Pa. Super. 2007) *Teodorski v. Teodorski*, 857 A.2d 194, 201 (Pa. Super. 2004), *quoting Anzalone, supra* at 785-786. "Counsel fees are awarded only upon a showing of need." *Teodorski*, 857 A.2d at 201, *quoting Harasym v. Harasym*, 486, 614 A.2d 742, 747 (Pa. Super. 1992). "In most cases, each party's financial considerations will ultimately dictate whether an award of counsel fees is appropriate." *Plitka v. Plitka*, 714 A.2d 1067, 1070 (Pa.Super. 1998). Also pertinent to our review is that, "in determining whether the court has abused its discretion, we do not usurp the court's duty as fact finder." *Teodorski* at 201, *quoting Verdile v. Verdile*, 536 A.2d 1364, 1369 (Pa. Super. 1988).

First, the master found that there was no quarrel with the

quantity of work or the hourly rate of the wife's attorney, in that the business evaluations were rather complex, and as always, vastly different. [Master's report, pp. 18-19.] Second, the master also determined that the Wife is disabled and incapable of employment, so she is financially limited in legally defending herself. [Master's report, p. 17.] Third, the master determined that the husband should not bear the full brunt of the wife's legal fees, which were approximately $35,509.56. [Master's Report, p. 19.] However, given the husband's litigious approach to this case, the complexity of this case, and the sizable value of the assets in this case, and the wife's financial situation, we agree with the master's recommendation awarding the wife reasonable attorney's fees in the amount of $15,000. Therefore, we will not disturb the master's recommendation and exception number eleven (11) is denied.

## VII. MASTER'S FINDING THAT WIFE IS SEVERALLY PHYSICALLY LIMITED. (Exceptions 5, 13).

We will now address husband's exceptions numbered five (5) and thirteen (13) to the master's report and recommendations. Husband concedes to wife's condition. [Husband's brief, p. 14.] However, husband contends that while wife's condition may prevent her from obtaining certain types of gainful employment, there is nothing of record indicating that wife made any attempt to seek employment or further her education or training for employment. [Husband's brief, p. 14.]

The master found that the wife has severe physical limitations, which will only grow worse with age. [Master's report, p. 15.] The master found that the husband made no mention of any physical difficulties, but the wife has an autoimmune system condition – either Lúpus or rheumatoid arthritis, which at the time of the report, was

attacking the wife's nerve functions in her left arm and has previously attacked the nerve functions in her right arm. [Master's report, p. 8.] Wife is forced to wear a back brace to do any lifting and tore the lining of her spinal cord resulting in spinal stenosis and two herniated discs approximately seven (7) years ago. [Master's report, p. 8.] Wife's treatment for her condition at this point is taking muscle relaxers and anti-inflammatory at night. [Master's report, p. 9.] A review of the record indicates that Husband did not testify with any contradictory evidence and raise no objections or contradictions to wife's testimony describing her physical limitations.

We find husband claims that the master found the wife capable of employment to be a misstatement. [Husband's brief, p. 14]. In the master's report, the master stated, "In regard to Wife, *while the Support Master found that she was capable of employment*, the Honorable Stephen Higgins, in his review of the support exceptions, found on page three (3) of his opinion 'Wife does not work outside the home and cares daily for her elderly mother and disable [sic] brother. Although wife worked for Husband when Brother's was formed, she has no marketable skills that would translate in the workplace.'" [Master's report, p. 9] (*emphasis added*). Upon review of the master's report, the divorce master did not make a finding that wife was capable of employment in his report. [Master's report, p. 9]. He simply stated that the support master found that wife was capable of employment and that in our opinion on the support exceptions, we determined otherwise. [Master's report, p. 9.] However, the divorce master did make a finding in his report that "wife is not employable." [Master's report, p. 10.]

As this is an issue of credibility, we give the greatest weight to the master's factual findings. After reviewing the record, we agree with the master that the record is

clear that wife is severely physically limited. Therefore, we will not disturb the master's finding on this issue and exceptions number five (5) and thirteen (13) are denied.

## VIII. MASTER'S FINDING AS AN ALIMONY FACTOR THAT WIFE'S EARNING POWER, EXPENSES OR FINANCIAL OBLIGATIONS ARE AFFECTED BY HER CARE FOR HER EIGHT-FIVE (85) YEAR OLD MOTHER AND SIXTY – TWO (62) YEAR OLD MENTALLY CHALLENGED DISABLED BROTHER. (Exception 14).

Husband contends that the master erred in considering the support of family members as a factor that affects wife's earning power, expenses, or financial obligations. In regards to this issue, the Master stated that factor seven – "'The extent to which the earning power, expenses or financial obligation of a party will be affected by reason of serving as a custodian of a minor child' *technically has no bearing in this matter* but one must remember plaintiff wife is the custodian of both her eighty-five (85) year old mother and her sixty-two (62) year old mentally challenged brother." [Master's report, p. 16] (emphasis added). We find that it is clear that the master put little to no consideration of this factor in coming to his decision. We will not disturb the master's finding in this matter. Therefore, husband's exception number fourteen (14) is denied.

## IX. MASTER'S FINDING HUSBAND PAY $8,000 PER MONTH IN PERMANENT ALIMONY AND HUSBAND PROCURE LIFE INSURANCE IN WIFE'S NAME IN THE AMOUNT OF $500,000 AS SECURITY FOR THIS AWARD. (Exceptions 16, 17, 18).

Husband contends that master erred in recommending that husband pay $8,000 per month in permanent alimony.

Based on the alimony factors, the master recommended that wife be awarded permanent alimony in the amount of $8,000 per month − $7,000 representing income and an extra $1,000 representing monies that she will need to obtain appropriate health insurance once the divorce is finalized. [Master's report, p. 17]. This amount is to be reduced by the amount of Social Security that sife receives when she applies for the same and that when she qualifies for Medicare that the extra $1,000 will be eliminated from the award that the need for health insurance has been supplanted by the government insurance. [Master's report, p. 17.]. Furthermore, the master recommended that the husband procure life insurance in wife's name in the amount of $500,000 as security for this award. [Master's report, p. 17-18].

"Alimony is based upon reasonable needs in accordance with the lifestyle and standard of living established by the parties during the marriage, as well as the payor's ability to pay." *Perlberger v. Perlberger*, 626 A.2d 1186, 1203 (Pa. Super. 1993). "[A]limony following a divorce is a *secondary remedy* and is available only where economic justice and the reasonable, needs of the parties cannot be achieved by way of an equitable distribution award and development of an appropriate employable skill." *Teodorski v. Teodorski*, 857 A.2d 194, 200 (Pa. Super. 2004)(emphasis in original).

In reviewing the master's equitable distribution scheme, we have already determined that the master's adoption of wife's valuation of the business was not contrary to law. The master determined that Brother's Auto Transport is a successful business and would be worth significantly less to the parties if it were liquidated and its assets sold. [Master's report, p. 12]. Instead of forcing the parties to liquidate the business, the master awarded all of the business interests and business property to husband.

[Master's report, p. 5]. To make up for this disparity, the master recommended that wife be awarded the martial home worth $244,400 and directed husband to either satisfy the existing debt of approximately $150,000 or assume it solely, as well as directed that husband be held responsible for the taxes the Ameriprise 401(K) account worth $231,662, which equates to approximately $62,800 owed in taxes, with the disparity of the award made by "substantial" or "permanent" alimony award. [Master's report, pp. 12-13].

It may appears that there is a significant disparity between the values of the assets awarded to the husband versus the value of the martial assets awarded to the wife, even after the martial debt accumulated by husband is subtracted. However, after subtracting the marital debt from the value of the business, husband was awarded a greater percentage of the marital property. The master sought to reimburse wife for the disparity by awarding her permanent alimony of $8,000 per month. In order to secure this award, the master recommended that husband secure a life insurance policy listing wife as the beneficiary in the amount of $500,000.

In light of the significant disparity in the equitable distribution scheme in favor of the husband, we agree with the master's recommendation and find that the permanent alimony award of $8,000 per month, plus ensuring the security of this award with a life insurance policy for $500,000 naming wife as the beneficiary is reasonable. This is true especially considering that if husband died, wife would no longer be entitled to alimony, which was awarded as remedy for the disparity in equitable distribution, as the obligation ends upon death of the party. Upon his death, the husband's estate would inherit the business and wife would inherit nothing. We agree that the life insurance policy here is an appropriate measure

to secure this award. Therefore, we will not disturb the master's finding on this matter and husband's exceptions numbered sixteen (16), seventeen (17), and eighteen (18) are denied.

## ORDER

And now, this 15th day of February 2013, ordered and decreed that Kathy M. Carney, plaintiff, and Donald R. Carney, defendant, are divorced from the bonds of matrimony.

The court retains jurisdiction of any claims raised by the parties to this action for which a final order has not yet been entered.

After consideration of the parties' briefs and following argument on defendant, Donald R. Carney's exceptions from the divorce master's recommendations, it is hereby ordered that the husband's exceptions are denied.